STATE of Utah, Plaintiff and Appellee,

v.

Raymond Phillip CABUTUTAN,
Defendant and Appellant.

No. 900289.

Supreme Court of Utah.

May 24, 1993.

Rehearing Denied Nov. 12, 1993.

R. Paul Van Dam, Atty. Gen., Judith S.H. Atherton, Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.

A.W. Lauritzen, Logan, for defendant and appellant.

HOWE, Associate Chief Justice:

Defendant Raymond Phillip Cabututan was one of four defendants convicted of second degree murder in the beating death of Miguel Ramirez, in violation of Utah Code Ann. § 76-5-203. He was also convicted of aggravated assault, in violation of section 76-5-103, and of a related misdemeanor. All four defendants were convicted in separate trials, and all four appealed. Their appeals have been separately considered: two by this court and two by the court of appeals. *See State v. Brown*, 853 P.2d 851 (Utah 1992); *State v. Cummins*, 839 P.2d 848 (Utah Ct.App.1992); *State v. Cayer*, 814 P.2d 604 (Utah Ct.App.1991).

## FACTS

The incident that resulted in the death of Ramirez occurred on October 25, 1989, at a small trailer camp commonly known as "Fingerpoint." The camp is located on a remote site on the Great Salt Lake's north-

west shore. The four trailers in the camp were owned by Western Brine Shrimp Company, which employed the four defendants and four other workers who witnessed the beating. The evening of the incident was a dark, cloudy, moonless night; the only outside lights for miles around the camp were the dim lights of the trailers. The violence began sometime between 9 p.m. and midnight as Cabututan and co-defendants William Cummins, Donald Brown, and Billy Cayer were sitting in one of the trailers drinking alcohol. Eddie Apodaca, another worker at the camp, came to the trailer. Cabututan and Apodaca began to argue, and Cabututan struck Apodaca with a wrench. Apodaca then returned to his trailer and told roommate Miguel Ramirez what had happened.

Minutes later, Brown, Cummins, Cayer, and Cabututan entered Apodaca and Ramirez's trailer. More fighting occurred, knives were drawn, and Ramirez left the trailer. The three co-defendants followed him outside. Cabututan came out later. The fight escalated, and Brown, Cummins, Cayer, and for at least part of the time, Cabututan attacked Ramirez with nunchakus, knives, and a wrench. They also kicked him as he lay on the ground. At approximately 5 a.m. the following day, he died of multiple blunt trauma injury.

The four defendants were arraigned in the district court on January 2, 1990, and the next day, separate trial dates were set. Cabututan's trial was scheduled to begin on January 22. On January 16, six days before his trial, he filed a notice of intent "to offer testimony of a mental health expert to establish mental state" under Utah Code Ann. § 77–14–3. He also moved as an indigent under section 77–32–1(3) and Utah Rule of Evidence 706 for the appointment of a psychiatrist and for a mental evaluation under section 77–14–4, all in support of a voluntary intoxication defense he intended to raise. The court held that notice of intent to offer such expert testimony had not been timely filed and on that basis denied all the motions.

At trial, Cabututan contended that he did not participate in the prolonged beating of Ramirez. Instead, he maintained that he hit Ramirez with a wrench in self-defense when Ramirez attacked him with a knife. Cabututan testified that he took the knife away from Ramirez and went back to his trailer, where he had another drink and then went to sleep. Cabututan raised the' defenses of self-defense and diminished capacity based on voluntary intoxication. He testified that he was intoxicated, as did other eyewitnesses, and a jury instruction on voluntary intoxication was given. Following his convictions, he moved for a new trial, but the court denied that motion.

## APPOINTMENT OF A PSYCHIATRIST

■ Cabututan contends that the trial court erred in denying his motions because (1) the notice filed on January 16 was timely, and (2) as an indigent, he had a due process right to psychiatric assistance in preparing his voluntary intoxication defense, relying on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Section 77–14–3(1) provides:

> When a defendant proposes to offer ... testimony of a mental health expert to establish mental state, he shall, at the time of arraignment or as soon afterward as practicable, but not fewer than 30 days before his trial, file and serve the prosecuting attorney with written notice of his intention to claim the defense.

Cabututan argues that the notice was timely filed under the circumstances since he was arraigned on January 2 and his trial was scheduled for January 22, just twenty days later, making it impossible for him to meet the thirty-day requirement in the statute. However, the trial court waived the thirty-day requirement, finding simply that "under the statute you haven't filed [the notice] timely." In other words, the trial court ruled that Cabututan did not give notice "at the time of arraignment or as soon afterward as possible." He gave notice on January 16, fourteen days after the arraignment. However, fourteen days after the arraignment was six days before trial, which the trial court concluded was too late. The court was anxious to expedite the four trials because all four defen-

dants were being held in custody and some of the witnesses had left the state.

We need not and do not here determine whether the trial court erred in denying Cabututan's motions because the denials, if erroneous, were harmless. At the same time that Cabututan moved for the appointment of a psychiatrist, he also moved for the appointment of a toxicologist "to determine the level of alcohol in [his] blood at the time of the alleged incident." That motion was granted, and a toxicologist was appointed.

At the trial, Cabututan was able to testify only generally as to how much he had to drink on the fateful night. In answer to the question "How many drinks did you have?" Cabututan replied: "I don't know. I drank what's gone out of there (a partially empty bottle of Jack Daniels whiskey) except for maybe two glasses.... You don't count how many glasses you drink, you know." He also testified that he drank a can of "Old Milwaukee's Best" and a glass of vodka. He described his condition as "pretty loaded" but said that he was not staggering and not like co-defendant Cayer, who he said was "just slobbering drunk" and "out of it." Cabututan further testified that he started drinking again the next morning, after he found out that Ramirez was dead.

Following this testimony, Cabututan's counsel sought to have the toxicologist testify as to Cabututan's level of intoxication. The prosecutor objected on the ground that there was not a sufficient foundation for the toxicologist to express an opinion. The court sustained the objection, observing that Cabututan drank before and after the altercations with Ramirez and resumed drinking the next morning. It further observed that some of the whiskey gone from the bottle was consumed by others. The court ruled:

> For the reason I indicated, I don't think we can identify exactly how much he drank or over what period of time, and the critical thing would be the [amount] ... prior to the incident. And so I just think there's no foundation on which you can base it.

Even though the toxicologist was not permitted to give an opinion as to Cabututan's level of intoxication and how Cabututan would be affected by it, the trial court did give the following instruction to the jury on the defense of voluntary intoxication:

> Voluntary intoxication shall not be a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense; however, if recklessness or criminal negligence establishes an element of an offense and the actor is unaware of the risk because of voluntary intoxication, his unawareness is immaterial in a prosecution for that offense. It is the defendant's burden to prove that this intoxication was so great that he was incapable of forming the necessary intent.

■ Cabututan has not raised as error on this appeal the exclusion of the toxicologist's testimony. However, we conclude that the exclusion was proper because of the lack of a sufficient foundation as to the amount of alcohol Cabututan consumed prior to the beating of Ramirez. A fortiori, if there was insufficient foundation for a toxicologist to testify, there would have been the same insufficiency facing a psychiatrist in testifying as to the effect of Cabututan's intoxication on his ability to form the requisite intent for the crimes charged. Therefore, assuming that defendant was entitled to the appointment of a psychiatrist as he maintains, the court's refusal to make that appointment was harmless error.

## PRIVATE INVESTIGATOR

■ Cabututan's second assignment of error is that the trial court abused its discretion in not entering an order for the appointment of a private investigator pursuant to section 77–32–1(3) until five days before trial and that this delay caused his attorney to be ineffective. There are two problems with this argument. First, the belated appointment of the private investigator was caused by the motion's being filed in the wrong court; it was filed in the

circuit court instead of the district court. Cabututan's attorney filed the motion on November 1. In a November 3 order, the circuit court declined to order the appointment of an investigator because "[t]he required procedure has not been complied with." Therefore, Cabututan's attorney was aware two days after filing the motion that it was denied on the basis of procedural considerations. There is no evidence in the record or reference in the briefs to when the second motion, which resulted in the appointment five days before trial, was filed in the district court.

Second, even though the appointment was belated, Cabututan's attorney had the assistance of the private investigator prior to November 7, thirteen days after the crime occurred. Tim Francis, the investigator, testified at trial that he visited the scene of the crime on November 7. Defense counsel acknowledged in his closing arguments at trial that Francis had been at the scene of the crime "two or three weeks" after the murder. We therefore find no error in the belated appointment.

### JURY VIEW OF CRIME SCENE

■ Cabututan next contends that the trial court abused its discretion in denying his motion for an order permitting the jury to view the scene of the crime pursuant to rule 17(i) of the Utah Rules of Criminal Procedure. That rule states, "When in the opinion of the court it is proper for the jury to view the place in which the offense is alleged to have been committed ... it may order them to be conducted in a body under the charge of an officer to the place." The crime occurred near midnight, and the only lighting was from dim trailer lights. The only eyewitness who stated that Cabututan was involved in the major part of the fight was Richard Anderson, and his testimony was inconsistent with his prior statements and those of other eyewitnesses. As a result, Cabututan argues, if the jurors could have viewed the scene, they would have found (1) that Anderson's line of sight was obstructed by door frames and vehicles, and (2) that due to the dim light, it would have been difficult for him to see

who was involved in the beating that took place outside the trailer.

■ In denying the motion, the trial court based its decision, inter alia, on two factors: (1) the lack of "assurance that the conditions which now exist at the site are the same presently as at the time of the alleged incident," and (2) "the availability of photographs which have previously been taken, diagrams of the area as well as maps and other exhibits and also the testimony of the witnesses as to the incident in question." The general rule as to granting or denying an order to view the premises states:

> A decision to order a viewing is within the discretion of the trial court. . . . A view should not be granted unless it appears to be reasonably certain or the court is satisfied that it will be of some aid to the jury in reaching its verdict and it is distinctly impracticable and inefficient to present the material elements to them by photographs, diagrams, maps, measurements, and the like. There is a presumption as to the correctness of the trial judge's ruling in the absence of a demonstration to the contrary, and that decision will not be upset absent a clear abuse of discretion.

75 Am.Jur.2d *Trial* § 259 (1991); *see also McCormick on Evidence* ch. 21, § 216 (John W. Strong ed., 4th ed. 1992); *State v. Roedl*, 107 Utah 538, 155 P.2d 741 (1945). In fact, it has been held that a court abuses its discretion if it permits the jury to view the scene if the conditions have changed. *See, e.g., People v. McCurdy*, 86 A.D.2d 493, 495–96, 450 N.Y.S.2d 507, 509 (App. Div.1982) (abuse of discretion to see scene because of change in conditions); *Grand Trunk Western R.R. v. Pursley*, 530 N.E.2d 139 (Ind.Ct.App.1988) (new trial granted because there was no proof that variable of accident, such as weather conditions and placement of bodies, approximated that of actual incident).

We find no abuse of discretion in the trial court's denial of the motion to view the scene. At the time the motion was made, the site of the crime was being used by an operating business enterprise. It is

therefore unlikely that the site would have been in the same condition in January as it had been in October, three months earlier. In addition, the trial court determined that photographs, diagrams, and maps were available which were sufficient to explain to the jury the physical layout of the crime scene. See *State v. Cayer*, 814 P.2d at 613, where the court of appeals found no abuse of discretion by the trial court in refusing to allow the jury hearing co-defendant Cayer's case to view the crime scene.

## JURY DELIBERATION

On the last day of trial, the court dismissed the jury sometime during the morning hours "to return home or whatever" until 1 p.m. During this recess, the court and counsel prepared the jury instructions. When the jurors returned, the court instructed them, and counsel for both sides presented closing arguments. The record does not disclose when the jury was dismissed to begin deliberations but only that the verdict was returned at 8:50 p.m. that same day.

■ Cabututan argues that because the jury had listened to four days of testimony, it could not have reviewed all of the testimony and evidence in just three hours. Thus, the jurors must have actually begun deliberations during the morning hours when many of them remained in the jury room waiting for court to convene at 1 p.m.

■ There is no support in the record for defendant's assertions. When the jury was dismissed in the morning, the jurors were admonished not to discuss the case until it was submitted to them. We have nothing before us to confirm that any of the jurors remained in the jury room, let alone began discussing the case. We do not presume error; the burden is on defendant to demonstrate it, which he has not done.

## PROSECUTORIAL MISCONDUCT

■ Cabututan complains of several incidents of prosecutorial misconduct. He asserts that Richard Anderson, the State's key witness, perjured himself and that the prosecution's use of his testimony violated the due process guarantee of the Fourteenth Amendment. He also charges that the prosecutor commented in a disparaging way in closing arguments about Cabututan's self-defense claims and that the prosecutor vouched for Anderson's credibility. However, Cabututan made no objections to any of this alleged misconduct at the time it occurred. Unless such objections are timely made, we do not consider them on appeal. "[I]t is the rule that if improper statements are made by counsel during a trial, it is the duty of opposing counsel to register a contemporaneous objection thereto so that the court may make a correction by proper instruction and, if the offense is sufficiently prejudicial, declare a mistrial." *State v. Tillman*, 750 P.2d 546, 561 (Utah 1987).

## DENIAL OF CONTINUANCE

■ Cabututan contends that the trial court erred in denying his motion for a continuance. The standard of review for the denial of a motion for continuance is abuse of discretion: "It is well-established that the granting of a continuance is discretionary with the trial judge. Absent a clear abuse of that discretion, the decision will not be reversed by this Court." *State v. Williams*, 712 P.2d 220, 222 (Utah 1985). Cabututan argues that when the continuance was not granted, he did not have sufficient time to prepare his defense. The court appointed counsel for Cabututan on October 31, 1989, six days after the crime occurred. Counsel had more than two and one-half months to prepare for trial. On January 10, Cabututan moved for a continuance. In its denial the following day, the trial court indicated that it was concerned that any further delay would lessen the chance that all witnesses could be present for the trial. This concern was well-founded. One of the witnesses was never found, and another had left the state but was found in Nevada prior to trial. Considering the circumstances in this case, we find no abuse of discretion in the trial court's denying the continuance.

Cabututan also argues that the denial of the continuance rendered his counsel ineffective because he had insufficient time to prepare a defense. Denying a continuance may result in the violation of a defendant's Sixth Amendment right to counsel. In interpreting the standard set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we stated that when claiming ineffective assistance of counsel, the defendant has the burden of demonstrating (1) that counsel's representation falls below an "objective standard of reasonableness" and (2) that any deficiency is prejudicial to the defendant. *State v. Frame*, 723 P.2d 401, 405 (Utah 1986). Although Cabututan charges several instances of conduct by his attorney which fell below an objective standard of reasonableness, he fails to show how these alleged deficiencies were prejudicial to him. As a result, we find no violation of Cabututan's Sixth Amendment right to effective assistance of counsel.

## DENIAL OF MOTION FOR NEW TRIAL

Cabututan next contends that the trial court abused its discretion in denying his motion for a new trial that he made on the ground of newly discovered evidence. He asserts that the testimony his three co-defendants gave at their subsequently held trials exculpates him and supports his claim of self-defense. The co-defendants refused to testify at Cabututan's trial, invoking the protection of the Fifth Amendment. He argues that if a new trial is granted him and the co-defendants again refuse to testify, a transcript of their testimony at their trials could be relied on.

At the time of the hearing on Cabututan's motion for a new trial, transcripts of the other trials were being prepared but were not yet available. In arguing the motion, Cabututan's counsel could only generally refer to the testimony of the co-defendants. Counsel attempted to show that their testimony corroborated Cabututan's testimony at his own trial that he had acted in self-defense.

We conclude that the trial court was unable to fairly determine the merits of the motion for a new trial without the availability of the transcripts of the other trials. They are now available. We therefore reverse the order denying a new trial and remand the case to the trial court to conduct anew the hearing on the motion for a new trial.

### PREJUDICE

We decline to consider defendant's assertions of prejudice on the part of the jury, the court, and the justice system because he failed to provide a legal analysis of these issues.

Affirmed in part and reversed and remanded in part.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.