**2018 UT App 103**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RYAN RANDY ROBINSON,
Appellant.

Opinion
No. 20160151-CA
Filed June 7, 2018

Third District Court, Salt Lake Department
The Honorable Roger S. Dutson
No. 121903822

Debra M. Nelson and Charity Shreve, Attorneys
for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1     Defendant Ryan Randy Robinson appeals his convictions of one count of murder, one count of aggravated assault, and one count of use of a firearm by a restricted person. Specifically, he appeals the trial court's refusal to allow him to cross-examine a witness (Witness) about a plea in abeyance and the trial court's refusal to allow the jury to be transported to the scene of the crime. We affirm.

BACKGROUND[1]

*The Shooting*

¶2     The State charged Robinson with the murder of the victim (Victim) as well as aggravated assault and use of a firearm by a restricted person, based on events that occurred on April 9, 2012.[2] At that time, Robinson and Victim were in a relationship and living together. On the day of the murder they were temporarily staying at Robinson's parents' home over the weekend while his parents were out of town. Witness, a friend of Robinson's—who was an instructor at the college Robinson attended—drove Robinson to his parents' home after their classes had ended for the day.

¶3     When they reached the Robinson home, Robinson invited Witness inside. Robinson and Witness went down to the basement and, while there, Robinson went into his father's bedroom and retrieved from a shelf a black and silver Smith & Wesson 9mm semiautomatic handgun to show Witness. Robinson claimed he had received it for his birthday. He and Witness "checked out" the gun, and Robinson "took the bullets out of it," after which he put the gun away.

¶4     Robinson and Witness then left to run an errand. When they returned, Robinson and Victim started to argue. The

---

1. "We recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Farnworth*, 2018 UT App 23, ¶ 4 n.1, 414 P.3d 1053 (quotation simplified).

2. Robinson does not appeal any specific errors related to the use of a firearm and aggravated assault convictions. As a result, we do not separately address or discuss the facts that underlie those convictions.

argument, though only verbal at that time, "escalated pretty quickly," and Witness, feeling "uncomfortable," started to leave. Robinson tried to "hold" Witness to keep him from leaving, telling Witness to "not . . . let it get to [him]." Around this time, Victim "ran out the front door," and Robinson chased after her. Witness "went straight to [his] car and left."

¶5     A neighbor (Neighbor) was in her backyard with her sixteen-year-old son (Neighbor's Son) when she observed Victim "running fast" past Neighbor's house, followed by Robinson. Both Neighbor and Neighbor's Son went to the front of their house "to see what was going on," and they saw Victim lying with her back on the ground and Robinson on top "punching," "kick[ing]," and "beating" her. Both neighbors described Robinson as being in a type of "rage." When Neighbor told Robinson to stop, Robinson got up and lunged at Neighbor, but he turned around when Victim alerted him that Neighbor's Son was on his phone, apparently dialing 911. Robinson then walked back to his parents' home, with Victim following behind. Neighbor and Neighbor's Son called the police and reported the incident.

¶6     Police officers arrived shortly after 3:00 p.m. and, after speaking with Neighbor and Neighbor's Son, knocked on the Robinson's door and rang the doorbell. Receiving no response, the officers checked windows and went around the back of the house. Eventually, more than thirty minutes later, Robinson emerged from the backyard to talk to the officers. The officers universally described Robinson as being in a state of emotional upset—that he was "[t]eary" and "shaking" and that he appeared to be "nervous," "agitated," "pretty aggressive," "[v]ery angry," and "annoyed." Though Robinson initially refused to allow the officers into the home, the officers told him that they would not leave without checking on Victim. Robinson then called into the house, telling Victim to come up to "show the police [he] didn't hurt [her]."

¶7     The officers spoke separately with both Robinson and Victim about the incident; both denied that their argument

became physical. Two of the officers carefully looked at Victim's face, head, and scalp but could see no injuries. They also did not see any injuries on Robinson's hands. Finding no evidence of assault, the officers left the home at approximately 4:16 p.m.

¶8 Meanwhile, after leaving the Robinson's home, Witness went to a mutual friend's (Friend) house where Robinson and Victim had been living. While there Friend received several phone calls from Robinson, some of which Witness overheard. In one of the early calls, Robinson told Friend that he and Victim were arguing. In the last phone call, Robinson informed Friend that he had shot Victim in the head and that she was dead, and he told Friend that he needed to "get some money [Friend] owed him." Witness, overhearing Friend question Robinson about whether he shot Victim, immediately called 911 and reported that Victim had been shot. He reported the incident at approximately 4:40 p.m.

¶9 The first responding officer arrived at the Robinson's home at approximately 4:50 p.m. The officer noticed a man—Robinson—walking down the street, and another of the neighbors flagged the officer down to let him know she had observed a gun tucked into the back of Robinson's pants as he walked by her house. The officer then attempted to approach Robinson, and a foot chase ensued, ending in Robinson's apprehension.

¶10 Other responding officers entered the Robinson's home and discovered Victim lying at the bottom of the basement stairs. The paramedics discovered a gunshot wound to Victim's head and, shortly after responding, they pronounced her dead. The responding officers also discovered several holes through which a single bullet appeared to have passed—a hole in the molding of the basement's "low hanging ceiling . . . at the bottom of the [basement] stairs," a hole in the basement door, and a "divot" in the kitchen ceiling. The officers also discovered a bullet in the cat's dish on the kitchen floor. At trial, witnesses—both fact and expert—testified about Victim's location at the time the gun was fired as well as the bullet's trajectory. Though various witnesses

disagreed on the exact stair on which Victim had been standing at the time she was killed, witnesses postulated that Victim had been standing on one of the basement stairs. Witnesses also postulated that the bullet had traveled in an upward direction from the basement, going first through the molding of the "low-hanging" basement ceiling, then entering the right side of Victim's head and exiting on the left, passing through the basement door to the kitchen ceiling, creating a "divot" in that ceiling, and finally coming to rest in the cat's dish in the kitchen upstairs. In addition, two handwritten notes were discovered in the kitchen, which read, "Accident, I love you," and, "I'm sorry. This was an accident, so will be the next."

¶11 Based on these events, the State charged Robinson with murder, a first degree felony. *See* Utah Code Ann. § 76-5-203 (LexisNexis 2017). The case proceeded to trial.

*The Trial*

¶12 At trial, both parties agreed that, despite the low basement ceiling, at the time Robinson shot Victim from the basement he would have seen at least part of her body on the stairs. The central issue at trial was whether Victim's death was merely reckless and accidental on Robinson's part, or whether it was knowing and intentional. Robinson asserted that he was guilty only of manslaughter—that Victim's death was the result of a "tragic accident" involving his unfamiliarity with, and reckless operation of, the gun. In contrast, the State asserted that, according to the elements of the variants of murder, Robinson intended his actions.[3] To that end, the State introduced several

---

3. The trial court instructed the jury that it could convict Robinson of murder if it found any one of four variants of murder, in accordance with Utah Code section 76-5-203. That section provides in relevant part that "[c]riminal homicide constitutes murder if"

(continued…)

fact witnesses to testify regarding their observations and involvement, including Witness, Neighbor, Neighbor's Son, the various responding police officers, and the lead detective on the case. The State also introduced several expert witnesses, including a ballistics expert, a bloodstain pattern analyst, and the forensic pathologist who performed Victim's autopsy.

¶13   Robinson made two motions during trial that are the subject of this appeal. First, Robinson apparently discovered on the second day of trial that Witness had previously pleaded guilty to theft by deception but that the plea had been held in abeyance. Robinson therefore moved under rule 608(b) of the Utah Rules of Evidence to cross-examine Witness about that

---

(…continued)

(a) the actor intentionally or knowingly causes the death of another;

(b) intending to cause serious bodily injury to another, the actor commits an act clearly dangerous to human life that causes the death of another;

(c) acting under circumstances evidencing a depraved indifference to human life, the actor knowingly engages in conduct which creates a grave risk of death to another and thereby causes the death of another; [or]

(d)(i) the actor is engaged in the commission, attempted commission, or immediate flight from the commission or attempted commission of any predicate offense, or is a party to the predicate offense; (ii) a person . . . is killed in the course of the commission [or] attempted commission . . . of any predicate offense; and (iii) the actor acted with the intent required as an element of the predicate offense.

Utah Code Ann. § 76-5-203(2)(a)–(d) (LexisNexis 2017).

plea.[4] Robinson asserted that the plea was probative of Witness's character for untruthfulness, as required under rule 608(b). The court denied Robinson's request, finding that "it would certainly be more prejudicial than probative also because it's not actually a plea of guilty entered." While Robinson was therefore unable to cross-examine Witness about the plea itself, he otherwise extensively cross-examined Witness about what he characterized as Witness's apparent tendency to omit facts "when . . . talking to law enforcement."

¶14 Second, Robinson moved under rule 17(i)[5] of the Utah Rules of Criminal Procedure to have the jury transported to view the basement at the Robinson's home where the shooting occurred. Both parties agreed that the scene had changed since the crime because the homeowner had remodeled the basement following the shooting. Nevertheless, Robinson claimed that the jury view was "critical" and "crucial" to his case and that the jury needed to "personally observe the angles and obstructions," arguing that "[t]he angle of the stairs, the obstruction of the basement ceiling, and the location of both parties on the stairs casts considerable doubt on whether [he] could have been acting knowingly and intentionally where his vision was obstructed." He also asserted that, although the basement had been remodeled and the "paint and flooring ha[d] changed," the

---

4. It appears that the bulk of the discussion between the court and the parties on this matter took place in chambers, unrecorded. Robinson briefly recounted on the record some of what occurred in chambers, but both Robinson's recounting and the court's reasoning and decision are limited. There has been no attempt to supplement the record on this point, and we are accordingly limited in our review.

5. Robinson moved for a jury view under rule 17(j) of the Utah Rules of Criminal Procedure. Since that time, the rule has been renumbered, and we therefore cite to the current jury view provision—17(i)—in this decision.

important aspects, such as the approximate ceiling height, "remain[ed] primarily the same."

¶15    To support this assertion, Robinson offered testimony from his father, who testified that he had the "whole [basement] redone." For the ceiling, he testified that where it had been tiled with molding at the bottom, the tile was removed and the ceiling sheetrocked, which he opined changed the ceiling height about "an inch." He also testified that he had completely replaced the stairs with thinner treads and carpeted them. As for the rest of the basement, where it had been open before, separate rooms had been walled off and finished.

¶16    The State opposed Robinson's motion, arguing that the significant changes to the basement meant that the jury would view "a completely different scene" than the one in which Victim was shot, which it asserted would only be "confusing," particularly in light of the photographs and other visual evidence of the scene that would be presented during trial. The State also argued that the outcome of Robinson's motion was controlled by *State v. Cabututan*, 861 P.2d 408 (Utah 1993), in which our supreme court affirmed the trial court's denial of a motion to view a crime scene in part because it was "unlikely that the site would have been in the same condition" as it had been at the time of the crime. *See id.* at 412–13. The trial court agreed with the State and denied the motion.

¶17    The jury convicted Robinson of all charges. Robinson appeals.

ISSUES AND STANDARDS OF REVIEW

¶18    Robinson argues that the trial court abused its discretion by refusing to allow him to cross-examine Witness regarding his theft by deception plea in abeyance under rule 608(b) of the Utah Rules of Evidence. "Trial courts have broad discretion in restricting the scope of cross-examination, and on appeal the trial court's ruling . . . is reviewed under an abuse of discretion

standard." *State v. Valdez*, 2006 UT App 290, ¶ 7, 141 P.3d 614 (quotation simplified). "In circumstances where evidence should have been admitted, it is reviewed for harmless error. If it is reasonably likely a different outcome would result with the introduction of the evidence and confidence in the verdict is undermined, then exclusion is harmful." *State v. Colwell*, 2000 UT 8, ¶ 26, 994 P.2d 177.

¶19    Robinson also argues that the trial court exceeded its discretion when it denied his motion to transport the jury to the crime scene. While allowed under the Utah Rules of Criminal Procedure, jury views are rare, *see State v. Doutre*, 2014 UT App 192, ¶ 10, 335 P.3d 366, and "[i]t is within the discretion of the trial court whether to allow jurors to view a crime scene," *State v. Cayer*, 814 P.2d 604, 613 (Utah Ct. App. 1991). We will not reverse the trial court's decision "unless the trial court has clearly abused that discretion." *Id.*

¶20    Relatedly, Robinson argues that the trial court's denial of his request for a jury view violated his constitutional right "to present a meaningful and complete defense, and was fundamentally unfair." While Robinson contends this issue was preserved, as we explain below, we conclude that it was not. We therefore review this issue for plain error, as Robinson alternatively requests. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Kennedy*, 2015 UT App 152, ¶ 23, 354 P.3d 775 (quotation simplified).

ANALYSIS

I. Witness Impeachment

¶21    Robinson argues that the trial court improperly precluded him from cross-examining Witness under rule 608(b) of the Utah

Rules of Evidence about Witness's theft by deception plea in abeyance.[6] This is the type of error to which we generally apply a harmless error analysis. *See State v. Aleh*, 2015 UT App 195, ¶ 19, 357 P.3d 12. Thus, to prevail on this issue, Robinson must demonstrate not only that the trial court erred by disallowing the cross-examination but also that the error was harmful—that is, but for the error, "it is reasonably probable that the result would have been more favorable for the defendant." *State v. Thomas*, 1999 UT 2, ¶ 26, 974 P.2d 269 (stating that demonstrating "the mere possibility of a different outcome" absent the error "is not enough; instead, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict" (quotation simplified)); *see also State v. Miranda*, 2017 UT App 203, ¶ 44, 407 P.3d 1033 ("In determining whether an error in a criminal case is harmless, we may consider several factors, including the following: the importance of the complained-of evidence to the prosecution's case, whether that evidence was cumulative, and the overall strength of the prosecution's case." (quotation simplified)).

¶22    Rule 608(b) provides,

> Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness.

Utah R. Evid. 608(b). A line of questioning on cross-examination regarding specific instances of a witness's past conduct that is admissible under rule 608(b) "may still be limited or prohibited

---

6. The record does not identify the nature of the underlying conduct that gave rise to Witness's theft by deception charge.

by the trial court in its sound discretion under rule 403." *State v. Gomez*, 2002 UT 120, ¶ 33, 63 P.3d 72. Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403.

¶23    Here, the basis of the court's decision to disallow the cross-examination is unclear. The court stated on the record its finding that "it would certainly be more prejudicial than probative [to allow the cross-examination] because it's not actually a plea of guilty entered." This statement arguably raises some question about whether the court disallowed the testimony under rule 403, or whether the court instead determined that the plea in abeyance itself did not qualify as evidence admissible under rule 608(b). And, as we have noted, *supra* note 4, we do not have the full record of the 608(b) proceedings to otherwise clarify the court's reasoning.

¶24    However, we conclude that, even assuming for purposes of argument that the trial court erred in disallowing the cross-examination, Robinson has not demonstrated that, absent the alleged error, there is a reasonable probability that the jury's verdict would have been more favorable to him had the evidence been admitted. *See State v. Colwell*, 2000 UT 8, ¶ 26, 994 P.2d 177 ("In circumstances where evidence should have been admitted, it is reviewed for harmless error."). On that basis, we affirm the trial court's decision.

¶25    Robinson argues that the court's error was harmful because Witness's testimony "was important to the State's case" for two reasons. First, Robinson claims that the State relied on Witness's testimony to establish that Robinson was familiar with the gun, which he claims made it "less likely" that the jury would believe "he unintentionally discharged the gun" the day Victim was killed. Second, he claims that Witness's testimony undermined his defense "by providing support for the State's argument that [he] was angry enough to be physically aggressive toward [Victim]." He contends that it was therefore "essential . . . to be able to challenge [Witness's] credibility by

cross-examining him about his prior dishonest act—theft by deception—to show that [Witness] had fabricated the incidents" to which he testified. We are not persuaded.

¶26   To begin with, contrary to Robinson's assertion that Witness's testimony "established" that Robinson was familiar with the gun, Witness's testimony was only that Robinson had showed him the gun, that Robinson got the gun from "[s]omewhere on his dad's shelf," and that he and Robinson "checked out" the gun before Robinson put it back. More importantly, however, Witness's testimony was cumulative to statements Robinson himself made to the lead detective who investigated the shooting. *See Miranda*, 2017 UT App 203, ¶ 47 (observing that "when erroneously admitted evidence is cumulative of evidence already before the factfinder, the error may be considered harmless"). The detective testified that Robinson said he got the gun from his dad's room in the "dresser, cabinet area," and he had showed the gun to Witness, after which he put the gun away. Indeed, Robinson's statements to the detective about the gun were more specific than Witness's testimony. The detective testified that Robinson told him the gun was a black and silver 9mm, there were boxes of ammunition in the "same cabinet area" where the gun was, and he had taken the bullets out of it around the time he showed the gun to Witness.

¶27   Witness's testimony regarding Robinson's physical aggression and state of mind was also cumulative to other evidence introduced at trial. *See id.* While Witness testified that the argument between Robinson and Victim "escalated pretty quickly," he also testified that the argument he witnessed was only verbal. He offered no testimony that Robinson was physically aggressive with Victim; his only testimony about physical aggression was that Robinson "got a little bit physical" with him by attempting to "hold" him to keep him from leaving.

¶28   On the other hand, several other witnesses testified to Robinson's physical aggression and state of mind closer in time to the shooting. For example, both Neighbor and Neighbor's Son

testified that they witnessed Robinson punch, kick, and beat Victim, and both described him as being in a "rage." Neighbor further testified that Robinson was physically aggressive towards her, lunging at her when she told Robinson to stop beating Victim. And the police officers who responded to the initial welfare check variously described Robinson as being "agitated," "annoyed," "belligerent[]," "pretty aggressive," and "[v]ery angry." In fact, one of the officers testified that Robinson's anger and apparent emotional state caused him to be concerned enough that he specifically positioned himself to be in one of the other officer's line of sight while talking with Robinson.[7]

¶29    In addition, although the court did not allow Robinson to cross-examine Witness about the plea in abeyance, Robinson otherwise thoroughly cross-examined Witness about his "tendency" to omit facts when talking with law enforcement and pointed out inconsistencies in Witness's testimony. For example, Robinson highlighted Witness's failure to initially tell police that he had gone with Robinson to a liquor store before going to the Robinson's home, that he had looked at and handled the gun, or that Robinson had tried to physically restrain him from leaving; indeed, Robinson was able to have Witness admit outright that he was "willing to omit facts to law enforcement." Robinson also highlighted certain inconsistencies in Witness's testimony, such as the number of times Robinson called him after he left the

---

7. Relatedly, Robinson suggests that Witness's testimony was important to the jury's verdict because the jury could have disregarded the neighbors' testimony regarding his "rage" where the police at the initial welfare check did not detect injuries on Victim consistent with being punched and kicked. While he is correct that the police did not detect injuries on Victim's face or head in their initial welfare check, Robinson fails to acknowledge that evidence from Victim's postmortem examination suggested injuries that could be explained by his beating.

house. And, in his closing, Robinson suggested to the jury that Witness was a "horrible witness" and had "zero credibility," and he urged the jury "not to believe a single thing" Witness had said.

¶30 For these reasons, we conclude that Robinson has not demonstrated that denying him an opportunity to cross-examine Witness about the plea in abeyance was harmful.[8]

## II. Jury View

¶31 Robinson argues that the trial court abused its discretion by denying his motion to transport the jury to view the scene

---

8. Robinson also fleetingly argues that the trial court's decision violated his constitutional rights of confrontation and cross-examination. *See generally State v. Maestas*, 564 P.2d 1386, 1387 (Utah 1977) ("The right to cross-examine is an invaluable right embodied in Article I, Section 12 of the Utah Constitution and in the Sixth Amendment of the United States Constitution which assures the right to confrontation." (quotation simplified)). But there is no suggestion in the record that Robinson argued to the trial court that the denial of his motion would violate these constitutional rights. Accordingly, his constitutional arguments are unpreserved. *See State v. Kennedy*, 2015 UT App 152, ¶ 21, 354 P.3d 775 ("An issue is preserved for appeal when it has been presented to the trial court in such a way that the trial court had the opportunity to rule on it."). Nevertheless, Robinson requests that we review the issue under the plain error exception to our preservation requirement. He must therefore establish that the constitutional errors were obvious and harmful. *State v. Bond*, 2015 UT 88, ¶ 48, 361 P.3d 104. In doing so, he relies on his prejudice discussion related to rule 608(b) to establish prejudice related to this plain error claim. His plain error challenge therefore fails for the same reasons his rule 608(b) challenge fails—that is, he has failed to establish that the alleged errors were harmful.

where the shooting occurred. He contends that his defense was that "the discharge of the firearm . . . was unintentional—the result of a tragic accident," and he asserts that his defense "depended on the jury's ability to accurately visualize" the scene "to understand the unlikelihood that [he] intentionally discharged the gun toward [Victim]." He also argues that the court's error in denying his motion deprived him of "his due process right to present a complete and meaningful defense."

## A. The Court's Discretion

¶32 Rule 17(i) of the Utah Rules of Criminal Procedure authorizes a trial court to order a jury view of the place where the crime was committed:

> When in the opinion of the court it is proper for the jury to view the place in which the offense is alleged to have been committed . . . it may order them to be conducted in a body under the charge of an officer to the place, which shall be shown to them by some person appointed by the court for that purpose.

Utah R. Crim. P. 17(i).

¶33 Jury views of crime scenes are rare, *State v. Doutre*, 2014 UT App 192, ¶ 10, 335 P.3d 366, and the reasons are evident through the considerations relevant to deciding whether to grant or deny a request for one. These considerations include "the availability of other sources of documentary evidence and/or witness testimony; whether conditions at the site have changed since the time of the incident; and any logistical difficulties that may be associated with coordinating and executing an out-of-court excursion." *See United States v. Santiago*, 203 F. Supp. 3d 1135, 1137 (D. Colo. 2016) (quotation simplified). We will not reverse a trial court's consideration of the relevant circumstances and its ultimate decision on this issue unless the appellant demonstrates a clear abuse of discretion. *See State v. Cayer*, 814

P.2d 604, 613 (Utah Ct. App. 1991) ("It is within the discretion of the trial court whether to allow jurors to view a crime scene and that decision will not be reversed unless the trial court has clearly abused that discretion."); *see also State v. Cabututan*, 861 P.2d 408, 412 (Utah 1993) ("There is a presumption as to the correctness of the trial judge's ruling [regarding a jury view] in the absence of a demonstration to the contrary, and that decision will not be upset absent a clear abuse of discretion." (quotation simplified)).

¶34 In this regard, our supreme court has noted the general rule that a court should not grant a jury view unless "it is distinctly impracticable and inefficient to present the material elements . . . by photographs, diagrams, maps, measurements, and the like." *See Cabututan*, 861 P.2d at 412 (quotation simplified). In addition, "it has been held that a court abuses its discretion if it permits the jury to view the scene if the conditions have changed." *See id.*; *see also United States v. Culpepper*, 834 F.2d 879, 883 (10th Cir. 1987) (concluding that the trial court did not abuse its discretion in denying a request for a jury view of the crime scene—a field—where "an exceedingly rainy fall would have changed the field's condition substantially" and photographs of the scene taken a day after the crime were admitted); *State v. Ervin*, 792 S.E.2d 309, 316 (W. Va. 2016) (concluding there was no abuse of discretion in denying a request for a jury view where the scene "was no longer as it was on the night of the shooting due to the removal of some vehicles that might be of issue and the absence of foliage that would have been there" and where "there were numerous photos and other documents available to present at trial to allow the jury to visualize the scene").

¶35 Here, we conclude that the trial court did not exceed its discretion when it denied Robinson's motion to transport the jury to the scene of the shooting. The court denied the motion because it determined that the crime scene was "not in the same condition that it was" at the time of the crime. To reach this conclusion, the court relied on the holding of *Cabututan* as well

as testimony from the homeowner regarding the various changes made during a remodel of the basement after the shooting. These changes included alterations that changed the various heights and angles involved at the time of the crime, such as replacing the ceiling tiling and molding with sheetrock, replacing the stair treads and carpeting them, and otherwise closing off portions of what had been the open basement area.

¶36   Given the changes to the scene, it was not unreasonable for the court to deny the motion to view it. *See Cabututan*, 861 P.2d at 412–13 (concluding that it was not an abuse of discretion to deny the motion to view the scene where it was "unlikely that the site would have been in the same condition . . . as it had been . . . three months earlier" when the crime took place); *see also State v. Revels*, 99 A.3d 1130, 1139–40 (Conn. 2014) (concluding there was no abuse of discretion where a tree involved in the line of sight at a crime scene would not have had leaves at the time of the crime but would have had leaves at the time of trial). Simply put, the scene Robinson wanted the jury to visit would not have been the scene in which Victim was shot; both parties agreed that the heights, interior spaces, and building materials had all changed since the crime was committed. Accordingly, the court did not exceed its discretion under rule 17(i) in denying Robinson's jury view motion.

B.    Due Process

¶37   Robinson also argues that the denial of his motion violated his constitutional right to present a meaningful defense. *See generally Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (quotation simplified)). He contends that this issue was preserved but asks us to review it under plain error if we determine that it is not.

¶38 We conclude that the issue is not preserved. Although Robinson asserts that this argument was preserved at trial through his contention that the jury view was "critical" and "crucial" to his defense, we disagree that these assertions were sufficient to properly preserve the constitutional arguments he now presents. "An issue is preserved for appeal when it has been presented to the trial court in such a way that the trial court had the opportunity to rule on it." *State v. Kennedy*, 2015 UT App 152, ¶ 21, 354 P.3d 775. This means that the "party asserting error on appeal must have (1) raised the issue in a timely fashion in the lower court, (2) specifically raised the issue, and (3) introduced supporting evidence or relevant legal authority." *In re Baby Girl T.*, 2012 UT 78, ¶ 34, 298 P.3d 1251 (quotation simplified). "[A]n objection at trial based on one ground . . . does not preserve for appeal any alternative grounds for objection." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867. And even if it may be claimed that an issue was raised "indirectly," that issue must still "at least be raised to a level of consciousness such that the trial judge can consider it." *In re Baby Girl T.*, 2012 UT 78, ¶ 34 (quotation simplified).

¶39 In his motion, Robinson requested a jury view only under rule 17(i) of the Utah Rules of Criminal Procedure and made no argument—either in writing or orally—that his request should also be evaluated in terms of his constitutional right to present a meaningful and complete defense. *See id.* Furthermore, nothing about the words "critical" or "crucial" could have reasonably alerted the trial court that Robinson was invoking his constitutional right to present his defense as a separate basis to justify his rule 17(i) request.[9] *See id.*

---

9. As the State points out, Robinson's reliance on *In re Baby Girl T.*, 2012 UT 78, 298 P.3d 1251, is misplaced. In that case, our supreme court determined that, although the appellant did not "use the words 'due process' until his motion to reconsider," "[t]he briefing in the district court was infused with due process

(continued…)

¶40     We therefore review this unpreserved issue for plain error. To establish that a court plainly erred in light of his right to present a complete and meaningful defense, Robinson must demonstrate the constitutional error was obvious and harmful. *See State v. Bond*, 2015 UT 88, ¶ 48, 361 P.3d 104. In this regard, Robinson must establish both that there is "settled appellate law to guide the trial court" such that the error would or should have been obvious, *see State v. Roman*, 2015 UT App 183, ¶ 9, 356 P.3d 185 (quotation simplified), and that "absent the error, there is a reasonable likelihood of a more favorable outcome" for him, *see Bond*, 2015 UT 88, ¶ 36 (quotation simplified). Robinson cannot satisfy this test.

¶41     First, Robinson has not established that the alleged error would have been obvious to the trial court. Although Robinson claims in general that denying his motion violated his constitutional right to present a meaningful defense, Robinson has not demonstrated that there is "settled appellate law"—in Utah or in other jurisdictions—suggesting that denying a request for a jury view runs plainly afoul of that right. *See Roman*, 2015 UT App 183, ¶ 9 (stating that the appellant had directed this court to "no Utah authority to support his argument"; explaining that "[w]ithout clear guidance in the law, any error would not have been obvious to the district court"; and concluding that as a result the appellant could not "avail himself of the plain error exception" (quotation simplified)); *see also State v. Mitchell*, 2013 UT App 289, ¶ 44, 318 P.3d 238 (concluding that the appellant had not demonstrated obvious error where he

---

(…continued)

implications, arguments, and cases." *See id.* ¶ 36. The same cannot be said here. Robinson used only rule 17(i) cases and arguments to support his claim to a jury view. And while he used the words "crucial" and "critical" in describing the need for the jury to view the scene, he made no attempt at any time to explain the constitutional implications of denying his motion. *See id.*

"cite[d] no authority" supporting the proposition that the error alleged "can constitute an obvious trial error" and instead cited a case that only "generally" discussed the right he contended was violated).

¶42 Second, Robinson has not demonstrated that, had the trial court allowed the jury to view the remodeled scene, there is a reasonable likelihood that the outcome of the trial would have been more favorable to him. *See Bond*, 2015 UT 88, ¶ 36. As noted in this opinion, the basement's remodel altered the scene in which Victim had been shot, and apart from contending that the jury needed to view the unique angles and heights in play to fully comprehend his defense, Robinson has not explained how viewing the remodeled basement—where the heights and building materials have been altered since the crime occurred— would have swayed the jury into believing that he recklessly and accidentally shot Victim.

¶43 In this regard, we agree with the State's contention that viewing the scene would not have changed the basic facts to which all parties have agreed—that, at the time Robinson shot Victim, at least part of her body would have been visible to him, and that, given the trajectory of the bullet, the gun was necessarily aimed in Victim's direction at the time it was fired. In light of these facts, we further agree with the State that whether the firing was accidental seems to turn on circumstantial evidence, such as evidence about Robinson's state of mind around the time of the shooting, not on whether (or how much) the ceiling heights and stair angles might have obscured Robinson's view of Victim's head.

¶44 Along those lines, it is also significant that the jury was not required to find that Robinson intended to kill Victim in order to convict him. The jury was instructed that it could convict Robinson of murder if it found that he "[c]ommitted an act clearly dangerous to human life with the intent to cause serious bodily injury to [Victim]," which caused her death; that he acted "under circumstances evidencing a depraved indifference to human life, knowingly engaged in conduct which

created a grave risk of death to another and thereby caused" Victim's death; or that he "[e]ngaged in the commission or attempted commission of a Discharge of a Firearm," "[Victim] was killed in the course of the commission or attempted commission" of the firearm's discharge, and Robinson "knew or had reason to believe that any person may be endangered by the discharge of a firearm."

¶45   In other words, the jury could have concluded that perhaps Robinson did not intend to outright kill Victim but that he was still guilty of murder because, seeing Victim standing on the stairs, he nevertheless pointed and fired the gun in her direction. Robinson has not attempted to explain how viewing the remodeled scene would have been reasonably likely to dispel all the potential variants of murder in play to convince the jury that Victim's killing was merely reckless.

¶46   Moreover, in making his argument that the jury view was critical, Robinson seems to rely heavily on his expert's testimony that it was important to view the crime scene firsthand to understand the relationships of the heights and angles involved. But the jury was provided extensive visual evidence, including many photographs from the actual crime scene and a video made by investigating officers shortly after the shooting, as well as various witnesses discussing the crime scene. Robinson fails to explain why, given that evidence, a visit to the remodeled scene would have been reasonably likely to convince the jury that he was merely reckless in killing Victim.

¶47   For these reasons, we conclude that the trial court did not exceed its discretion or otherwise plainly err in denying Robinson's motion to transport the jury to the scene.[10]

_____

10. Robinson also requests that we reverse on the basis of cumulative error, arguing that "[e]ven if none of the errors discussed . . . are prejudicial on their own, taken together, they undermine confidence in the fairness of [his] trial." "[T]he

(continued…)

CONCLUSION

¶48     We conclude that any assumed error in the trial court's denial of Robinson's motion to cross-examine Witness about a plea in abeyance under rule 608(b) does not undermine our confidence in the verdict. We also conclude that the trial court did not abuse its discretion in denying Robinson's motion to transport the jury to the crime scene. Finally, we conclude that Robinson has not established plain error based on either decision. Accordingly, we affirm Robinson's convictions.

———————

(…continued)

cumulative-error doctrine may only be considered when the appellate court has determined, or assumed without deciding, that two or more errors occurred." *State v. King*, 2017 UT App 43, ¶ 15, 392 P.3d 997. Because we have not concluded that the trial court committed multiple errors in this case, the cumulative error doctrine does not apply. *See id.*