**2018 UT App 165**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BREANNA LYNN HORVATH,
Appellant.

Opinion
No. 20160789-CA
Filed August 23, 2018

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 141910232

Alexandra S. McCallum, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES GREGORY K. ORME and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1 Breanna Lynn Horvath appeals her convictions of one count of obstruction of justice and one count of reckless driving. Regarding her obstruction of justice conviction, Horvath argues that the trial court erred by refusing her request for a lesser-included-offense instruction and that she received constitutionally ineffective assistance of counsel because her counsel failed to object to an allegedly erroneous instruction. As to her reckless driving conviction, she argues that the court incorrectly entered the conviction as a class A misdemeanor rather than a class B misdemeanor. We affirm Horvath's obstruction of justice conviction, but we vacate her reckless driving sentence and remand the case to the trial court to correct

the penalty classification and to amend her sentence accordingly on that count.

BACKGROUND

*The Car Chase*

¶2 Horvath's convictions arise from a car chase involving Horvath, another driver (Other Driver), and a detective (Detective). In July 2014, West Valley City police officers were surveilling a house near 4000 West and 3500 South. The police had received information that a witness to a homicide frequented this particular house. The officers were in plain-clothes, and their vehicles were unmarked. One of the officers (Officer) was parked in a lot facing the house, while Detective was parked in a grocery store parking lot on 4000 West, facing the street.

¶3 Officer observed two people exit the house around the same time, and he alerted Detective. The first person to exit, Other Driver, entered a Pontiac. The second person, Horvath, entered a Subaru. Both cars drove away from the house "[w]ithin seconds" of each other, with Other Driver leading.

¶4 Meanwhile, Officer and Detective confirmed Other Driver's identity through a records check and discovered that he was on parole, that the car he was driving was registered to him but uninsured, and that his license was invalid. Officer and Detective determined Detective would initiate a traffic stop with Other Driver and Officer would assist him once the stop was made.

¶5 From his parked location, Detective watched Other Driver drive past him. Other Driver looked at Detective "quite heavily," making sustained eye contact with Detective while he drove by. Detective observed Horvath pass by him "immediately" afterward, at which point Detective "pulled out on to the street" behind the two cars. Once Detective did so, both cars "began to

accelerate very, very rapidly" toward the intersection of 4000 West and 3500 South. Detective then saw both cars make right turns onto 3500 South "against the red light with . . . no signal."

¶6 Detective continued to follow Other Driver and Horvath, observing them drive aggressively and apparently in tandem with one another. They merged into the center passing lane on 3500 South, using it "as a travel lane" to speed past the traffic waiting for the light at the Bangerter Highway intersection. Detective estimated that the cars were traveling at approximately sixty miles per hour. Both cars then ran the red light at Bangerter Highway, continuing east on 3500 South toward the I-215 interchange. Detective followed them, working his way closer through the traffic.

¶7 The center turn lane that both cars had been using as a travel lane became a bus lane after Bangerter Highway, and 3500 South eastbound opened up to three travel lanes. Detective observed both cars merge right, out of the center lane, and into slower traffic. At that point, both Other Driver and Horvath continued to drive "very aggressively," cutting off other vehicles, making abrupt lane changes without signaling, and accelerating around other vehicles. To keep up with the cars, Detective had to employ similarly aggressive driving tactics.

¶8 After several blocks, at approximately 3300 West, Detective caught up to Other Driver, ending up "directly behind" him within one car length. In doing so, Detective lost sight of Horvath. Detective activated his lights and siren, signaling Other Driver to pull over. Although Detective's vehicle was unmarked, Detective testified at trial that it was equipped with a combination of white, red, and blue flashing lights around all sides of the vehicle at various heights and locations, and that the lights were "very, very visible" from every direction. When activated, lights flashed in the headlights, the brake lights, the grill, the fog lights, and on bars around the front, sides, and back.

¶9    Other Driver did not stop. Instead, he "continued to accelerate" and drive aggressively, "cutting off cars, driving around cars quickly, [and] not using [his] signal." From Detective's perspective, Other Driver appeared to be "run[ning] from [him]." Detective tried to keep up with Other Driver by driving in the same aggressive manner over several blocks. During this time, Detective did not observe Horvath's location.

¶10    As Other Driver and Detective approached 2900 West, Other Driver merged into the innermost lane to pass a slowing vehicle in the center lane, and Detective followed. After passing the slowing vehicle, Other Driver merged back into the center lane. Detective tried to follow Other Driver into that lane, but as he began to merge, Detective saw "out of [his] peripheral vision" Horvath accelerating toward his vehicle into the center lane at the same time, "almost causing a collision." Indeed, Detective testified that he "had to jerk [his] wheel back into the [innermost] lane to avoid a collision." While she merged into the center lane, Horvath kept her car parallel with Detective's vehicle, and Detective testified that Horvath "maintained direct eye contact" with him for three to five seconds, that he did not observe "any panic" or "shock on her face" as if she had merged accidentally, and that she was looking at him with an aggressive expression on her face, as though she was "mad at [him]."

¶11    Thereafter, Horvath did not move out of Detective's way, but continued to stay in the center lane, blocking him from pursuing Other Driver. Although Detective was eventually able to work his way around other vehicles to continue the pursuit, Other Driver had gained too much ground. When Detective saw Other Driver merge onto I-215, he broke off pursuit.

*The Trial*

¶12    The State charged Horvath with reckless driving and with obstruction of justice with respect to Other Driver's criminal conduct of failing to respond to Detective's signal to stop. The case proceeded to a one-day jury trial. Detective was the State's primary witness, and he was the only witness who testified

regarding the details of the pursuit and Horvath's obstruction. Neither Horvath nor Other Driver testified.

¶13  The State asserted at trial that Horvath had obstructed Detective's ability to apprehend Other Driver for failure to respond to Detective's signal. The seriousness of the offense being obstructed—failure to respond—made a conviction under this theory a felony.[1]

¶14  During trial, defense counsel asked the court to instruct the jury on a lesser included offense of misdemeanor obstruction of justice predicated on reckless driving. Defense counsel argued that a jury could find that "the only thing in [Horvath's] realm of knowledge" at the time she nearly merged into Detective's vehicle was that Other Driver had been driving recklessly, not that he had failed to respond. Defense counsel asserted that the evidence supported a finding that Horvath intended only to impede Other Driver's apprehension for reckless driving, which would lower the severity of the obstruction crime from a felony to a misdemeanor. The court denied defense counsel's request.

¶15  The jury convicted Horvath of both charges. Horvath timely appeals.


ANALYSIS

¶16  Horvath raises three issues on appeal. First, she argues that the trial court erred when it declined to instruct the jury on a

---

1. The penalty classification of obstruction of justice largely depends on the classification of the predicate criminal conduct. *See* Utah Code Ann. § 76-8-306(3) (LexisNexis 2017). Here, obstruction of justice predicated on failure to respond is a third degree felony. *See id.* § 76-8-306(3)(b)(i); *id.* § 41-6a-210(1)(b)(i) (2014). Obstruction of justice predicated on reckless driving is a class A misdemeanor. *See id.* § 76-8-306(3)(c) (2017); *id.* § 41-6a-528(2) (2014).

lesser included offense of misdemeanor obstruction of justice. In particular, she argues that misdemeanor obstruction of justice predicated on reckless driving is a lesser included offense of felony obstruction of justice predicated on failure to respond. She also contends that there is a rational basis in the evidence from which the jury could have acquitted her of the greater charge and convicted her of the lesser charge.

¶17   Second, she argues that she received constitutionally ineffective assistance of counsel when her defense counsel failed to object to the instruction for failure to respond. She claims that her counsel performed deficiently because the instruction obviously omitted the required mens rea for certain terms in the failure-to-respond instruction and that she was harmed thereby.

¶18   Third, she argues that the court erred in entering and sentencing her reckless driving conviction as a class A, rather than a class B, misdemeanor. We address each issue below, ultimately affirming her conviction for obstruction of justice predicated on failure to respond. However, we vacate her reckless driving sentence and remand the case for the limited purpose of correcting the classification of and sentence on her reckless driving conviction.

## I. Lesser-Included-Offense Instruction

¶19   Horvath was charged with obstruction of justice predicated on Other Driver's failure to respond to Detective's signal to stop, *see* Utah Code Ann. § 41-6a-210(1) (LexisNexis 2014),[2] which constitutes a third degree felony under the

---

2. As relevant here, Utah Code section 41-6a-210, the failure to respond statute, provides,

> (1)(a) An operator who *receives* a visual or audible signal from a peace officer to bring the vehicle to a stop may not: (i) operate the vehicle in willful or wanton disregard of the signal so as to interfere

(continued…)

obstruction of justice statute, *see id.* § 76-8-306(3)(b)(i) (2017). Horvath argues that she should be granted a new trial because the trial court incorrectly refused her request to instruct the jury on the lesser included offense of obstruction of justice predicated on the underlying offense of Other Driver's reckless driving, *see id.* § 41-6a-528 (2014),[3] which would have constituted a class A misdemeanor under the obstruction of justice statute, *see id.* § 76-8-306(3)(c) (2017).

¶20    Horvath frames this error as a statutory construction question; she asks us to construe the obstruction of justice statute as requiring a defendant to know that the criminal conduct on which the obstruction charge is predicated occurred. The obstruction of justice statute provides in relevant part,

─────────────────────

(…continued)

> with or endanger the operation of any vehicle or person; or (ii) *attempt* to flee or elude a peace officer by vehicle or other means.
> (b)(i) A person who violates Subsection (1)(a) is guilty of a felony of the third degree.

*Id.* § 41-6a-210(1) (2014) (emphases added).

3. Utah Code section 41-6a-528, reckless driving, provides,

> (1) A person is guilty of reckless driving who operates a vehicle: (a) in willful or wanton disregard for the safety of persons or property; or (b) while committing three or more moving traffic violations under Title 41, Chapter 6a, Traffic Code, in a series of acts occurring within a single continuous period of driving covering three miles or less in total distance.
> (2) A person who violates Subsection (1) is guilty of a class B misdemeanor.

> (1) An actor commits obstruction of justice if the actor, with intent to hinder, delay, or prevent the investigation, apprehension, prosecution, conviction, or punishment of any person regarding conduct that constitutes a criminal offense:
>
> . . .
>
> (b) prevents by force, intimidation, or deception, any person from performing any act that might aid in the discovery, apprehension, prosecution, conviction, or punishment of any person[.]

*Id.* § 76-8-306(1)(b). Horvath argues that obstruction of justice is a specific intent crime requiring a defendant to "act with knowledge of the predicate *conduct*" charged—in this case, failure to respond to a police officer's signal. And if a defendant is charged with felony obstruction, as she was here, Horvath argues that "that conduct must be of a nature that[,] if prosecuted, it would constitute a felony crime." As applied to her case, Horvath claims that she had to know that Other Driver committed the felonious criminal conduct underlying her obstruction charge—failure to respond to Detective's signal.

¶21    Employing similar reasoning, Horvath further argues that she was entitled to the lesser-included-offense instruction for obstruction based on reckless driving, asserting that there was a rational basis in the evidence from which the jury could have determined that she did not know that Other Driver had failed to respond to Detective at the time she obstructed Detective's attempts to apprehend Other Driver, but that she did know that Other Driver had committed reckless driving. *See generally State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788 (setting out the "two-pronged test" for deciding when a defendant is entitled to a lesser-included-offense instruction, which requires a defendant to show "(1) that the charged offense and the lesser included offense have overlapping statutory elements and (2) that the evidence provides a rational basis for a verdict acquitting the

defendant of the offense charged and convicting him of the included offense" (quotation simplified)).[4]

¶22 However, even if Horvath's interpretation of the obstruction of justice statute is correct and there is a rational basis in the evidence to support her requested instruction, to obtain reversal she must still persuade us that the trial court's refusal to give the lesser-included-offense instruction was harmful to her case. *See* Utah R. Crim. P. 30(a); *State v. Miranda*, 2017 UT App 203, ¶ 44, 407 P.3d 1033 (explaining that "for an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict" and that a defendant "bears the burden of showing that he was harmed by the trial court's error" (quotation simplified)). In particular, Horvath must persuade us that, had her requested lesser-included-offense instruction been given, there is a "reasonable likelihood" that she would have enjoyed "a more favorable trial result." *See State v. Whittle*, 1999 UT 96, ¶ 17, 989 P.2d 52; *see also State v. Reece*, 2015 UT 45, ¶¶ 32–39, 349 P.3d 712 (explaining that failure to give a lesser-included-offense instruction is subject to harmless error analysis); *State v. Fairchild*, 2016 UT App 205, ¶ 17, 385 P.3d 696 (explaining that "a new trial is not merited" where the alleged errors "are sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings" (quotation simplified)). We therefore assume, without deciding, that the court erred in refusing to give her requested instruction, and we proceed to consider whether Horvath has demonstrated that the alleged error was harmful.

---

4. The State concedes that the elements between obstruction of justice predicated on failure to respond and obstruction of justice predicated on reckless driving overlap for purposes of a lesser-included-offense instruction. For purposes of our analysis, we accept this concession but do so without reaching the merits.

¶23 Horvath contends that the alleged error was harmful because the evidence that she committed obstruction of justice predicated on failure to respond was "far from overwhelming." (Quotation simplified.) She argues that, because Detective lost sight of her for a few blocks around the time he activated his lights and siren, there was no direct evidence that she actually "witnessed [Other Driver] fleeing or otherwise knew that he committed Failure to Respond." In contrast, she claims that the evidence "more readily" supported that she knew Other Driver committed reckless driving at the time of her obstructive act. She suggests that it is therefore reasonably likely the jury "would have resolved" in her favor the doubt about whether she knew Other Driver had failed to respond to Detective.

¶24 We disagree. Although there was a lack of direct evidence about what Horvath might have observed during the time Detective lost sight of her, the circumstances surrounding Horvath's obstructive act overwhelmingly suggest that, at the time she obstructed Detective in his pursuit, she did so knowing that Other Driver had failed to respond to Detective's signal. *See Reece*, 2015 UT 45, ¶¶ 40–43 (concluding that a trial court's failure to give a requested lesser-included-offense instruction was harmless where the evidence overwhelmingly established the defendant's guilt for the charged, instructed offense); *cf. State v. Harris*, 2015 UT App 282, ¶ 9, 363 P.3d 555 (stating that "it is a well-settled rule that circumstantial evidence alone may be sufficient to establish the guilt of the accused" (quotation simplified)); *State v. Cristobal*, 2014 UT App 55, ¶ 4, 322 P.3d 1170 (stating that "where there is an absence of direct evidence supporting each element of the crime charged, a jury's guilty verdict must be based upon reasonable inferences," and explaining that "a reasonable inference is a conclusion that can be drawn from the evidence and is based on logic and reasonable human experience," where "the facts can reasonably be interpreted to support a conclusion that one possibility is more probable than another" (quotation simplified)).

¶25  To begin with, regardless of whether Detective temporarily lost sight of her, Horvath's obstructive act occurred in the larger context of a reckless driving spree in what appeared to be a concerted effort between Other Driver and Horvath to evade and flee from Detective. For example, Detective testified that Other Driver "stare[d]" at him, maintaining eye contact "the entire time [Other Driver] passed by" him, and that almost immediately upon Detective pulling out from his vantage point to follow them, both vehicles accelerated "very, very rapidly" away from him—Horvath following Other Driver. Detective testified that he observed both vehicles drive "very closely" and in tandem with each other, speeding, running red lights, passing vehicles by using the turning lane, and weaving aggressively around and cutting off vehicles without signaling when they could no longer use the turn lane for travel. While Detective testified that he thereafter lost sight of Horvath for several blocks, there was no suggestion in the evidence that Horvath did not stay nearby throughout Other Driver's flight. Indeed, the timing of Horvath's obstructive act strongly suggests the opposite—that, even if Detective could not see her, she continued to follow Other Driver.

¶26  In this regard, the more specific context in which Horvath's obstructive lane change occurred powerfully suggests that she knew Other Driver failed to respond to Detective's signal to stop when she blocked Detective from merging. For example, Detective testified that his vehicle, though unmarked, was equipped with a siren as well as a plethora of flashing lights—white, red, and blue—surrounding every side of the vehicle in various heights and locations. At the time Horvath merged to block Detective, his flashing lights and siren had been activated for approximately half a mile.

¶27  Detective also testified that he activated his lights and siren only when he maneuvered his vehicle directly behind Other Driver, one car length away; that, rather than slowing or stopping, Other Driver immediately responded by accelerating away from him and weaving aggressively around other vehicles

in an apparent attempt to flee; and that, to keep up with Other Driver, Detective had to drive with similar aggression. Although Detective may not have been able to see Horvath during the time that he activated his signal and proceeded through the several blocks of vigorous pursuit, Horvath demonstrated a present ability to block Other Driver's apprehension. Indeed, the timing of Horvath's obstructive lane change was precise and almost prescient; she accelerated from behind and merged into the center lane at the exact moment Detective attempted to follow a fleeing Other Driver into the center lane, boxing him in behind slowing vehicles in the innermost lane. She also maintained her vehicle parallel to his after merging, blocking Detective from maneuvering into the center lane in pursuit of Other Driver. Through these actions, Horvath showed a keen awareness of Detective's pursuit of Other Driver, one sufficient to anticipate Detective's merge and then deftly block it.

¶28 In these circumstances, the presence of mind and action that Horvath displayed cannot be reasonably explained away by mistake or ignorance. Rather, the contextual evidence strongly suggests that, before her act of obstruction, Horvath kept up with Detective and Other Driver through the several blocks of aggressive driving and thereby knew Other Driver was attempting to flee from Detective, fully mindful of Detective's signal to stop. Indeed, it strains credulity to suggest that, despite being available to block Detective at the exact moment he attempted to merge and after a significant stretch of aggressive driving, Horvath was nevertheless unaware of Detective's signal and Other Driver's flight from it. In this regard, Detective's testimony about Horvath's demeanor upon obstructing his lane change fairly supports an inference that she intended to block any further pursuit of Other Driver. Detective testified that she "maintained direct eye contact" with him "for a good few seconds" and that, rather than having an expression of shock indicative of a mistake, she "look[ed] at [him] like she was very, very aggressive or mad or was mad at [him]."

¶29   In sum, the context and circumstances surrounding Horvath's obstructive act overwhelmingly suggest that her ability to merge in the moment she did arose from purposeful maneuvering on her part based on her awareness of Detective's signal to stop and Other Driver's failure to respond to it. *See State v. Reece*, 2015 UT 45, ¶¶ 40–43, 349 P.3d 712. Accordingly, we are not persuaded that it is reasonably likely that, had the jury been instructed on obstruction of justice predicated on reckless driving, the jury would have acquitted her of obstruction of justice predicated on failure to respond by necessarily finding that Horvath did not know Other Driver failed to respond to Detective's signal. *See id.* Horvath has therefore not shown that it was reasonably likely she would have enjoyed a more favorable trial outcome had the court instructed the jury on obstruction of justice predicated on reckless driving. Thus, she is not entitled to reversal based on any such error.

## II. Mens Rea for Failure to Respond

¶30   Horvath also argues that she received constitutionally ineffective assistance of counsel when her counsel failed to object to the failure-to-respond jury instruction. To prevail on a claim for ineffective assistance, Horvath must demonstrate both that her counsel's performance was objectively deficient and that her counsel's performance was prejudicial to her defense—that is, "a reasonable probability exists that but for the deficient conduct defendant would have obtained a more favorable outcome at trial." *See State v. Lantz*, 2018 UT App 70, ¶ 7 (quotation simplified); *see also State v. Johnson*, 2015 UT App 312, ¶ 15, 365 P.3d 730 (same). "[A] failure to prove either element defeats the claim." *Johnson*, 2015 UT App 312, ¶ 15 (quotation simplified). We need not decide whether Horvath's counsel's performance was deficient if she has not demonstrated she was prejudiced by her counsel's performance. *See State v. Arguelles*, 921 P.2d 439, 441 (Utah 1996); *see also Strickland v. Washington*, 466 U.S. 668, 697 (1984) ("If it is easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

¶31 Horvath contends that the failure-to-respond instruction did not include the mens rea for two terms—"receives" and "attempts"—as required under our supreme court's decision in *State v. Bird*, 2015 UT 7, 345 P.3d 1141. In *Bird*, the Utah Supreme Court held that the trial court should have instructed the jury that, to find the defendant guilty of failure to respond, it must have found that the vehicle operator "*knowingly* received a visual or audible signal from a police officer" and *intentionally* attempted "to flee or elude a peace officer." *See id.* ¶¶ 18–24, 26 (emphasis added) (quotation simplified). Horvath further claims that the mens rea omissions were prejudicial because they prevented the jury from deciding whether Horvath "acted with the intent to prevent [Other Driver's] apprehension for Failure to Respond." Horvath asserts that the omission made it possible for the jury to convict her even if it found she believed that Other Driver was "unaware of [Detective's] signal to stop" and/or "the purpose of [Other Driver's] actions was not to flee or elude." In this regard, she contends that there was a rational basis in the evidence from which the jury could conclude that Horvath believed Other Driver was not intending to flee or elude Detective and that she believed Other Driver was unaware of Detective's signal to stop. On this basis, she claims that, had the jury been adequately instructed on the mens rea required for a failure to respond charge, it is reasonably likely she would have enjoyed a more favorable result.

¶32 But even assuming Horvath is correct that the jury instructions were erroneous and that her counsel should have objected to them, Horvath has not demonstrated that she was prejudiced by her counsel's performance. To begin with, no evidence was presented at trial suggesting that Other Driver did not "knowingly" receive Detective's signal or "intentionally" attempt to flee or elude Detective. Rather, the evidence of the circumstances surrounding Detective's activation of his lights and signal and Other Driver's immediate response only affirm

that Other Driver knew he had received a signal to stop and, by accelerating and maneuvering away, intentionally attempted to elude it. Detective turned on his lights and siren when he was directly behind Other Driver—a position from which it would have been nearly impossible for Other Driver to miss the signal—and the only testimony about Other Driver's actions afterward was that he accelerated away from Detective, aggressively weaving around cars for several blocks in an apparent attempt to flee as Detective tried to keep up with him. And although Detective's signal and siren remained on throughout the remainder of the pursuit, Other Driver never stopped in response to Detective's signal. Instead, he continued toward I-215 and was ultimately successful in his flight from Detective.

¶33   Further, as already discussed, *supra* ¶¶ 24–29, the circumstances surrounding Horvath's obstruction overwhelmingly suggest that she knew Other Driver intended to flee from Detective's signal to stop. Had she not, there would have been little purpose for her obstructive act—one which ultimately permitted Other Driver to escape Detective. As a result, even had the jury been correctly instructed under *Bird*, there is no reasonable likelihood that the result would have been more favorable to Horvath. Thus, her ineffective assistance of counsel claim fails.[5]

---

5. Horvath also argues that reversal is appropriate under the cumulative error doctrine. Under that doctrine, we "consider all the identified errors, as well as any errors we assume may have occurred" to determine whether, "even if the errors committed during the course of [her] trial were harmless individually, they were cumulatively harmful." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993). Horvath contends that both of the alleged instructional errors "increased the likelihood" that the jurors convicted her "even if they had doubts about the State's evidence." We disagree. Given the circumstances surrounding

(continued…)

## III. Reckless Driving Conviction

¶34 Horvath challenges as erroneous and void the judgment entered and the sentence imposed regarding her reckless driving conviction. This is the kind of error we review for correctness, affording no deference to the trial court's decision. *See State v. Fairchild*, 2016 UT App 205, ¶ 16, 385 P.3d 696.

¶35 The jury returned a guilty verdict on Horvath's reckless driving charge, and the trial court entered the conviction as a class A misdemeanor. For that conviction, the court then sentenced her to a jail term of 365 days, with 305 days suspended, and it also imposed a fine of $2,500. *See generally* Utah Code Ann. § 76-3-204(1)–(2) (LexisNexis 2017) (providing that a person convicted of a misdemeanor "may be sentenced to imprisonment . . . for a term not exceeding one year" for a class A misdemeanor, or "for a term not exceeding six months" for a class B misdemeanor); *id.* § 76-3-301(1)(c)–(d) (providing that a person "convicted of an offense may be sentenced to pay a fine, not exceeding . . . $2,500 for a class A misdemeanor conviction" or "$1,000 for a class B misdemeanor conviction"). Horvath argues that her reckless driving conviction was incorrectly entered as a class A misdemeanor instead of a class B misdemeanor and that her sentence was therefore illegal. *See* Utah R. Crim. P. 22(e)(1) (providing that a court "may correct a sentence when the sentence imposed" was improper under several enumerated circumstances, including when the sentence "exceeds the statutorily authorized maximums"); *State v. Candedo*, 2010 UT 32, ¶ 9, 232 P.3d 1008 (explaining that an

---

(…continued)

Horvath's obstruction of justice charge, we conclude that the assumed errors do not undermine our confidence that Horvath received a fair trial. *See id.*; *see also State v. King*, 2010 UT App 396, ¶¶ 35, 38, 248 P.3d 984 (noting that we are less likely to reverse under cumulative error when there is overwhelming evidence of a defendant's guilt).

appellate court may "vacate the illegal sentence without first remanding the case to the trial court" (quotation simplified)). The State concedes this issue on appeal.

¶36 Horvath's claim of error on this point and the State's concession are clearly supported by the plain language of the reckless driving statute. That section states that reckless driving is a class B, not a class A, misdemeanor. Utah Code Ann. § 41-6a-528(2) (LexisNexis 2014). The trial court therefore erred when it entered judgment and sentenced Horvath on this conviction as a class A misdemeanor rather than a class B misdemeanor. Thus, we vacate the judgment and sentence on this conviction, *see Candedo*, 2010 UT 32, ¶ 9, and we instruct the trial court on remand to enter judgment on Horvath's reckless driving conviction as a class B misdemeanor and amend its sentence accordingly.

## CONCLUSION

¶37 We affirm Horvath's obstruction of justice conviction. However, we remand for the limited purpose of correcting the offense classification of Horvath's reckless driving conviction and amending her sentence.

———————