2012 UT 77

**STATE of Utah, Plaintiff and Appellee,**

v.

**Antoine Darnell HARRIS, Defendant and Appellant.**

**No. 20100080.**

Supreme Court of Utah.

Nov. 9, 2012.

Mark L. Shurtleff, Att'y Gen., Christine F. Soltis, Asst. Att'y Gen., Melanie M. Serassio, Salt Lake City, for appellee.

Joan C. Watt, Jaqueline R. Hopkinson, Salt Lake City, for appellant.

Justice LEE, opinion of the Court:

¶ 1 Antoine Harris was charged with two counts of assault in January 2008. He appeared for a jury trial in October 2009 and was subsequently convicted of a class B misdemeanor assault. Harris now appeals, claiming that his jury was assembled in a manner inconsistent with the requirements of the Equal Protection Clause of the Fourteenth Amendment. We disagree and accordingly affirm.

I

¶ 2 In December 2007, Amber Wardle and Sarah Michel spent the day shopping. After their spree, the pair decided to return to Wardle's apartment, which she shared with her then-boyfriend, Antoine Harris. Wardle indicated to Michel that she wanted Harris to move out and that she wanted Michel there during the confrontation.

¶ 3 Soon after they arrived at Harris's apartment, a fight erupted between Wardle and Harris. During the course of their spat, Harris told Wardle that she should stop hanging out with Michel. After hearing this from the other room, Michel stepped into the bedroom to confront Harris. Michel and Harris exchanged barbs, and Michel informed Wardle that she was leaving because she was angry at Harris.

¶ 4 According to Michel, before she could reach the front door of the apartment, Harris shut the door and locked it. Harris then pushed her up against the door and started to choke her. In the midst of this tussle, Michel hurled a highly charged racial slur at Harris and told him to let her go. Michel stated that Harris eventually released her, but shortly afterward it appeared to her that he was going to hit Wardle. Michel testified that she intervened, at which point Harris jumped on top of her and began to choke her again.

¶ 5 Harris's version of events was somewhat different. He testified at trial that instead of locking Michel in the apartment, he in fact had attempted to usher her out of the house when she suddenly attacked him. In an attempt to defend himself, Harris grabbed Michel by the neck and pushed her away. It was at this point that Michel used the racial epithet, which Harris admitted infuriated him; thus provoked, Harris conceded that he started to choke Michel.

¶ 6 In the midst of the skirmish, Michel told Wardle to get help. Wardle ran out of the apartment, prompting Harris to leave Michel and chase after Wardle. The police ultimately arrived and catalogued Michel's injuries. Based on their accounts and Michel's injuries, Harris was charged with one count of aggravated assault, a third-degree felony,[1] and one count of domestic violence assault, a class B misdemeanor.[2]

¶ 7 Harris appeared for a one-day jury trial on October 28, 2009. The trial court conducted standard jury selection, assembling a venire and conducting voir dire. After several members of the jury venire were dismissed for cause, the court invited trial counsel to exercise their peremptory strikes. As counsel deliberated, the judge passed the time by reading aloud an excerpt from an article entitled "Do You Swear that You Will Well and Truly Try?"[3]

¶ 8 After the peremptory strikes were completed and submitted to the judge, the court asked defense counsel whether he "pass[ed] the jury for cause." Defense counsel replied, "I think we need to approach the bench," and immediately added, "Oh, we do pass for cause, yes." The following sidebar ensued:

> DEFENSE COUNSEL: The concern we have is Juror Number 3 was struck by the State. He's the only minority on the jury, so (inaudible) want a *Batson* challenge on this, she needs to justify why she (inaudible) the only minority on the jury.
>
> COURT: All right, do you have a reason for that?
>
> PROSECUTOR: Yeah, (inaudible).
>
> COURT: Alright, why don't we put that on the record during the break?
>
> DEFENSE COUNSEL: Okay, I just wanted to inform you of that (inaudible).[4]

¶ 9 The court then announced the names of the selected jurors. It asked both the prosecutor and defense counsel "is that the jury you have selected?" Both responded in the

---

1. *See* Utah Code § 76–5–103.

2. *See id.* § 76–5–102.

3. As Harris notes, this dated article included a series of inappropriate stereotypes of potential jurors, presented in the form of old-timey advice once dispensed to the criminal bar—long-since discredited pearls of "wisdom" like the notion that defense attorneys should avoid "German[s]," who are "bull-headed," and "Swedes," who are "stubborn," in favor of "Jews" and "Irishmen" who are "easiest to move to emotional sympathy." Such stereotypes have no place in our judicial system. They certainly should not have been propagated by the court. But although the content of the article was inappropriate, its reading does not affect our decision on appeal, as Harris asserts no claim that the judge's conduct injected reversible error into the trial.

4. Although the court's audio recording is garbled in places and does not perfectly capture what was said, our independent review of it reveals the substance of the sidebar and confirms that the entire sidebar lasted less than forty seconds.

affirmative, stating "it is, your honor." Without further objection by defense counsel, the remainder of the venire was dismissed, including Juror Number 3, and the jury was sworn. During the subsequent recess, the court noted that defense counsel had "ask[ed] to approach the bench on a *Batson* challenge" and invited counsel to "make that on the record now." Defense counsel then made the following record:

> [B]ased on the state's taking off Juror No. 3, who clearly was the only minority on the jury, as I looked through . . . my notes on his answers, there's nothing in there that would indicate any reason to take him off the jury other than the fact that he was 27 years old and was obvious[ly] . . . of the Asian race and so I think the State has to justify why they took that person off the jury.

¶ 10 The court then asked the prosecutor to explain his strike, to which he responded:

> [W]hen I was watching [Juror No. 3] during the time that [the judge] was reading the story to the jurors, he was not paying attention. He kept putting his head down, he wasn't listening and that concerns me when someone doesn't want to pay attention. I also noted in my notes that he kept looking at me funny and so any time I get a bad feeling from a juror and if they're not paying attention, initially I was going to leave him on and then he just wasn't paying attention. He has to pay attention during the jury trial.
>
> I had concerns about (inaudible) [another juror] as well but the defense had struck her. I didn't know if she would have any problems with her or anything but . . . the defense struck her as number four, but she was actually paying attention and listening to what [the court] had to say and [Juror No. 3] was not paying attention.

¶ 11 After the prosecutor's response, the court confirmed that Harris was not Asian but was a minority, and then asked if there was "[a]nything else [they] need[ed] to put on the record." Defense counsel replied:

> Judge, I guess my response to that is, it's hard for somebody to tell if somebody is paying attention. People have different ways of paying attention and this is a smaller room (inaudible) reading to them or talking to them and so the fact that somebody is looking around or something, I don't think is necessarily they're not paying attention. So I don't think that's sufficient, but just so the record is clear.

The court responded to this last statement, saying "Thank you. Alright. We'll recess for about 10 minutes," to which defense counsel replied, "Thank you, Your Honor."

¶ 12 With that, the trial proceeded. At the conclusion of the State's case-in-chief, the court dismissed the simple assault charge based on insufficient evidence. Following its deliberation, the jury convicted Harris of a class B misdemeanor assault, a lesser-included offense of the initial charge of aggravated assault. Harris appealed.

## II

¶ 13 Harris challenges his conviction on the ground that "the State's use of a peremptory challenge to strike the only member of a racial minority group from the jury venire violated the Equal Protection Clause of the Fourteenth Amendment." Harris's argument rests on the prohibition of racial discrimination in jury selection laid out in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under *Batson*, parties generally "may exercise peremptory strikes to remove jurors during jury selection for virtually any reason, or for no reason at all." *State v. Rosa–Re*, 2008 UT 53, ¶ 7, 190 P.3d 1259 (internal quotation marks omitted). That general rule is qualified, however, by the proposition that "parties in a criminal action may not discriminate against potential jurors by exercising peremptory challenges solely on the basis of race." [5] For the reasons set forth below, we conclude that Harris failed to timely preserve his *Batson* challenge, the trial court did not err when it did not make findings or rule on the *Batson* challenge, and Harris's ineffective assistance of counsel claim based on his counsel's failure to timely preserve his *Batson* challenge fails under *Strickland*.

5. *State v. Colwell*, 2000 UT 8, ¶ 14, 994 P.2d 177.

### A

¶ 14 Harris contends that his *Batson* challenge was both timely raised and erroneously rejected. Whether Harris's challenge was timely is a question of law that we review for correctness.[6] For the reasons discussed below, we conclude that Harris's challenge was untimely.

¶ 15 A properly made *Batson* challenge involves three steps. The challenging party must first make a "prima facie case of purposeful discrimination in the selection of the petit jury." *State v. Valdez*, 2006 UT 39, ¶ 15, 140 P.3d 1219. Once the *Batson* objection has been raised and clearly articulated, "the burden shifts to the proponent of the peremptory challenges to rebut the prima facie case by offering neutral, nondiscriminatory justifications for the peremptory challenges." *Id.* "Finally, if the proponent provides a sufficient explanation for the peremptory challenges, the trial court must determine whether the opponent of the peremptory challenges has proven purposeful discrimination." *Id.*

¶ 16 It is not enough, however, for a party to raise a *Batson* challenge and expect opposing counsel and the court to complete the heavy lifting. A *Batson* challenge "must be raised in such a manner that the trial court is able to fashion a remedy in the event a *Batson* violation has occurred." *Id.* ¶ 44. This prerequisite entails not only specificity in the substance of the challenge, but also a critical timing element: The objecting party must raise and press his challenge "before the jury is sworn and the venire dismissed." *Rosa–Re*, 2008 UT 53, ¶ 14, 190 P.3d 1259.

¶ 17 This timing element is not drawn arbitrarily. As we have noted, trial courts ought to resolve *Batson* objections while the iron is hot since "[t]he burden-shifting framework of *Batson* is best implemented if it is litigated while the peremptory strikes are fresh in the minds of both the court and the litigants." *Valdez*, 2006 UT 39, ¶ 42, 140 P.3d 1219. That said, however, "in the event

that the trial court fails to timely resolve a *Batson* objection, [trial] counsel ... has an *absolute obligation* to notify the court that resolution is needed *before* the jury is sworn and the venire dismissed." *Rosa–Re*, 2008 UT 53, ¶ 14, 190 P.3d 1259 (emphases added). This obligation to timely press for resolution is so incumbent on the moving party, we have warned, that "[f]ailure to do so, or acquiescing in the court's inaction, will ... constitute a waiver of the original objection." *Id.* (footnote omitted).

¶ 18 In light of this timing requirement and the "absolute obligation" of trial counsel to demand resolution of a *Batson* challenge before the jury is sworn and the venire dismissed, we conclude that Harris waived this challenge by failing to properly and timely ask for its resolution. Harris's characterization of what happened at trial does not persuade us to the contrary. Harris maintains that he timely presented his objection and that the prosecution failed to carry its burden at the second step of the *Batson* challenge, asserting that "the prosecutor's explanation did not contain the type of specificity and details necessary to demonstrate that the challenge was racially neutral." Harris also insists that not only did he raise the requisite objection in the first sidebar but that the district court's resolution of the *Batson* issues was complete at that point. Thus, Harris argues that the subsequent record made by the parties after the jury pool was dismissed was merely a memorialization of what had already happened. This characterization simply doesn't jibe with the record, however, and we accordingly reject it.

¶ 19 In the initial sidebar, defense counsel indicated only that the State needed to "justify" its peremptory strike of Juror Number 3. In the limited time she had, the prosecutor apparently gave a quick, race-neutral explanation. After hearing the explanation, the court indicated that it would allow the attorneys to put the matter on the record "during the break." Harris's counsel made no objection, instead responding with the compliant

---

6. *See State v. Valdez*, 2006 UT 39, ¶ 11, 140 P.3d 1219 ("Whether [a] *Batson* challenge was timely raised is a question of law.")

comment, "Okay, I just wanted to inform [the court] of that."

¶ 20 More importantly, he also made no objection when the court subsequently read the selected juror names, asked Harris's counsel whether this was the jury he had selected, and proceeded to dismiss the remaining venire before the promised "break." Instead, counsel responded to the judge's inquiry about whether the jury announced was the one he had selected by stating, "it is, your honor."

¶ 21 What happened next only further highlights defense counsel's acquiescence. When the parties met again at the break to put the matter "on the record," the court thanked them for their argument without making any findings or ruling on the challenge. And, once again, instead of objecting or requesting that the court correct the error, Harris's counsel simply replied, "[t]hank you, Your Honor." Harris's acquiescence in the court's inaction could not have been clearer.[7] Accordingly, based on his failure to demand a ruling and resolution on his objection, we conclude that Harris waived his *Batson* challenge.[8]

**7.** If the case had proceeded as Justice Nehring suggests-with the court rejecting counsel's demand for a timely resolution of his *Batson* claim and expressly requiring "counsel to delay his *Batson* challenge until a time when our precedent declares it untimely," *infra* ¶ 42—then that would indeed present a troubling problem. But that is not what happened here. Defense counsel never clearly asserted a request to have the *Batson* issue resolved before dismissal of the jury venire, and the court never rejected any such request.

In the initial sidebar, the judge merely indicated that defense counsel would have the chance to put his *Batson* challenge on the record *during the break*—without indicating when the break would occur, or whether it would happen before or after he seated the jury and dismissed the venire. Thus, the court's ruling requiring a delay until the "break" did not itself close the door on timely preservation of a *Batson* challenge. It left that matter open, as a resolution of the *Batson* issue during a "break" before the dismissal of the venire could still be timely.

When the court subsequently proceeded to read the names of the jurors, and asked defense counsel whether this was the jury he had selected, *then* the timing problem was squarely presented. It was at that point that counsel's preservation duty was framed in sharp focus, as that

### B

¶ 22 Harris also asserts that, even if we conclude that his *Batson* challenge was not timely, we "can review the error under ... the plain error doctrine." He further posits that a "*Batson* error is a 'structural error' that is not subject to a conventional prejudice analysis." Accordingly, Harris argues that this court could reach these issues "even if he had not [properly preserved the *Batson* issue]." The State, for its part, insists that not only did Harris waive his *Batson* challenge but that he "also invited any alleged error" and therefore cannot obtain relief through plain error. We disagree with both positions.

¶ 23 First, we reject the State's notion that Harris invited or "planted" any error. His failure, as explained above, was that he failed to adequately preserve his *Batson* challenge, not that he openly induced the court's error. Next, for the reasons discussed below, we conclude that Harris cannot make out a case of plain error.

¶ 24 The plain error doctrine is a carefully circumscribed exception to the requirement of preservation. *See State v. Munguia*, 2011 UT 5, ¶ 12, 253 P.3d 1082. We invoke this exception sparingly.[9] To

was the point of no return for resolution under *Batson* (since it was then clear that the break would not occur prior to the dismissal of the venire). And at that point, as before, counsel responded only with a statement of acquiescence ("it is, your honor"). Only after defense counsel had affirmatively acquiesced in the jury selected did the court proceed to dismiss the venire. Thus, the court afforded defense counsel an additional opportunity—once it had become clear that the venire would be dismissed prior to any break—to make a timely *Batson* challenge. Counsel's failure to avail himself of that opportunity amounted to waiver, in a manner not implicating the problematic scenario adverted to by Justice Nehring.

**8.** This conclusion is bolstered by the fact that the sidebar lasted less than forty seconds. *Supra* ¶ 8 n. 4. From what dialogue can be gleaned from the trial record, it's obvious that although Harris's trial counsel raised a *Batson* challenge, he failed to ask the court for resolution of that challenge before the jury was sworn and the venire dismissed.

**9.** *See State v. Scott*, 22 Utah 2d 27, 447 P.2d 908, 910 (1968) ("[T]here may be exceptional circumstances when errors not excepted to are so clear-

show plain error, a party must establish three things: (1) that an error exists, (2) that the error should have been obvious to the trial court, and (3) that the error is harmful. *Id.* In order to show harm, the complaining party must demonstrate that "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *Id.* (internal quotation marks omitted).

¶ 25 Harris's waiver of his *Batson* objection ends our inquiry before we reach the question of prejudice. Plain error requires not only that error exist, but that it be "obvious to the trial court." *Id.* (internal quotation marks omitted). The *Batson* violation alleged by Harris could not have been "obvious" to the trial court. Indeed, an evaluation of the alleged error is effectively foreclosed by Harris's failure to complete and press for timely findings on the questions of the prosecution's neutral justification and purposeful discrimination.

¶ 26 Harris's waiver is compounded, moreover, by the fact that defense counsel did not even challenge the prosecution's neutral explanation as pretextual, but simply challenged the conclusion that it necessarily precluded a finding of discrimination. That move effectively thwarted the court's capacity to address the questions it would have to resolve if it looked past counsel's waiver and reached the merits in this case, including (a) whether the district court's determination of a race-neutral justification was facially sufficient; and (b) if so, whether the district court

erred in finding a lack of purposeful discrimination. Those decisions, moreover, would be reviewed under a standard that would afford some deference to the district court, which had an opportunity to view the behavior of counsel and of the venire during the selection and voir dire process.[10]

¶ 27 The problem is that no such findings were requested or entered. And since our position on appeal is far removed from the intimate, first-hand knowledge of the trial court, we can hardly accept the defense's position that there was discrimination at face value.[11] Thus, even if we determined that the trial court erred in not resolving Harris's *Batson* challenge, the only remedy available to us would be a remand for a new trial or for appropriate findings. But both options would be unreasonable.

¶ 28 A new trial based solely on *not* seating a juror would be a novel move for this court and would swiftly undermine the efficiency of our trial courts. Worse, it would perversely incentivize defense counsel to take the same (in)actions Harris's counsel did here. We cannot and will not allow litigants to silently sow the seeds of error so that they may be reaped in the event of an undesirable verdict.[12]

¶ 29 And if we were to remand, the findings required of the trial court would be practically impossible. First, the court would have to decide whether the proffered justification was sufficiently race-neutral, re-

ly erroneous and prejudicial to the fundamental rights of a defendant that an appellate court will of its own accord take notice thereof."); *see also State v. Irwin*, 924 P.2d 5, 8 n. 3 (Utah Ct.App. 1996) (clarifying that on "issues not properly preserved for appeal ... plain error is itself an infrequently used exception to the general rule").

10. *State v. Higginbotham*, 917 P.2d 545, 548 (Utah 1996) (upholding trial court's overruling a *Batson* challenge where the "trial court was involved in the voir dire process and observed firsthand the prosecutor's demeanor," the trial court observed "that the prosecutor's reason was clear and specific and made without any hesitation," and that "facial expressions or body language ... provide a sufficient basis to support the exercise of a peremptory challenge").

11. *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 40, —— P.3d ——, 2012 WL 4486225 ("Findings of fact .... entail[ ] the

empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind. Since the lower court often has a comparative advantage in its firsthand access to factual evidence ... [s]uch findings are accordingly overturned only when clearly erroneous." (first alteration in original) (citation omitted) (internal quotation marks omitted)).

12. *See Valdez*, 2006 UT 39, ¶ 44, 140 P.3d 1219 ("[T]o allow a *Batson* challenge to proceed after the venire has been dismissed is only to sanction abuse. If such a result were allowed, a party would be able to delay raising a *Batson* challenge until it determined whether it approved of the selected jury. Such sandbagging is antithetical to notions of judicial economy and procedural fairness.").

lated to the trial at hand, reasonably specific and clear, and legitimate. *State v. Higginbotham,* 917 P.2d 545, 548 (Utah 1996). And if it deemed the prosecutor's explanation sufficient, the court would then have to determine whether there actually *was* purposeful discrimination, weighing the prima facie showing of discrimination and the neutral explanation. This would require the district court to summon the implicated juror, mentally reconstruct the scene of the voir dire, recall observations of individualized behavior, make appropriate findings, and rule on the issue—all of this months or years after the fact. No court could make such findings with any reliability or objectivity.

¶ 30 Thus, because Harris waived his *Batson* challenge, he cannot now establish that there was error or that any supposed error would have been obvious to the trial court. We therefore conclude that Harris cannot establish plain error, and accordingly affirm his conviction.[13]

## C

¶ 31 Harris finally contends that the court can reach his challenge because "defense counsel was ineffective for failing to insist that the court clearly resolve the challenge." He insists that his attorney was deficient—within the meaning of the first prong of the test articulated in *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)—in not "obtain[ing] an explicit, oral ruling regarding the *Batson* challenge before the jury was sworn and the venire dismissed, and to object to the empaneled jury."

¶ 32 We need not determine whether counsel's performance was deficient under the first prong of *Strickland* because Harris's ineffective assistance claim clearly fails under the second prong. To satisfy *Strickland*'s second prong, Harris was required to "affirmatively prove prejudice" by "show[ing] that there [wa]s a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." *Id.* at 693–94, 104 S.Ct. 2052. Harris has failed to make this showing, and we affirm on that basis.

¶ 33 Counsel's failure to properly press a *Batson* challenge would be actionable under *Strickland* only if the *Batson* challenge itself could be shown to be plausibly meritorious. Put conversely, the failure to press a losing *Batson* challenge cannot satisfy *Strickland*'s second prong because a procedurally proper but meritless *Batson* claim could not be shown to have changed the result of the proceeding below.

¶ 34 Harris's *Strickland* claim falters on that basis. The sum and substance of Harris's *Batson* challenge is his assertion that Juror Number 3 was Asian. That fact standing alone is likely insufficient even to establish a prima facie case at *Batson* step one. *See State v. Cantu,* 750 P.2d 591, 597 (Utah 1988) (noting that mere identification of a juror's race is insufficient; requiring allegation of discrimination on the basis of race). And it surely falls short of establishing the ultimate question under *Batson*—of purposeful discrimination on the basis of race. *Batson,* 476 U.S. at 86–87, 95, 98, 106 S.Ct. 1712. Harris's failure to identify facts sufficient to sustain a finding of purposeful discrimination foil his *Strickland* claim, as the failure to assert a losing *Batson* challenge could not have altered the result at trial.

¶ 35 As noted above, *Batson* prescribes a three-step process: (a) a prima facie case of purposeful discrimination in the use of a peremptory challenge; (b) rebuttal by the party employing the challenge by proffer of neutral, nondiscriminatory justifications; and (c) if sufficient neutral justifications are given, proof of purposeful discrimination. *Supra* ¶ 15. Harris has failed to demonstrate the viability of his *Batson* challenge under this framework. Even assuming for the sake of argument that Harris cleared the prima facie hurdle at step one, the evidence in the record suggests no basis for a finding of

13. Harris also urges us to adopt the view that *Batson* errors are structural in nature and therefore obviate the prejudice inquiry under the plain error standard. Because we conclude that any error here could not have been obvious to the trial court, however, we need not and accordingly do not reach the prejudice question or the "structural error" ground for avoiding proof of prejudice.

purposeful discrimination upon evaluation of the record evidence under steps two and three.

¶ 36 Under step two, the record indicates that the prosecutor asserted that Juror Number 3 was struck because he was not paying attention and was looking at the prosecutor "funny." Such justifications—going to juror inattentiveness—"deserve[ ] careful scrutiny" to assure that there is specific juror behavior supporting the justification. *See United States v. Johnson*, 4 F.3d 904, 913 (10th Cir.1993) (internal quotation marks omitted). But the prosecutor's explanation here satisfied that standard as his explanation was specific and plausibly related to the obvious need for jurors to pay attention during trial. And race-neutral explanations at *Batson* step two need not be particularly "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The persuasiveness or plausibility of the step two explanation is evaluated at step three, where the court is charged with deciding whether the peremptory strike was a result of purposeful discrimination. *Id.*

¶ 37 We see no basis—and Harris has offered none—for a finding of purposeful discrimination under step three. In response to the prosecutor's race-neutral explanation, defense counsel only vaguely asserted that he felt this explanation was not "sufficient" because it was "difficult to tell if someone is paying attention." That is hardly persuasive proof of "purposeful discrimination." And absent anything more than the hunch from the juror's race and vague doubts about the prosecutor's explanation, we conclude that Harris has failed to identify any basis for concluding that his unpreserved *Batson* claim would have succeeded if it had been timely raised. That failure also thwarts Harris's *Strickland* claim, as any deficiency in the presentation of a meritless *Batson* challenge could not have altered the result at trial.

## III

¶ 38 Harris waived his *Batson* objection by not timely pressing for resolution of his challenge. And because he waived his challenge, he cannot show that there was error or that any such error would have been obvious to the trial court. We accordingly decline to engage in plain error review and affirm the conviction below.

Justice LEE authored the opinion of the Court, in which Chief Justice DURRANT, Justice DURHAM, and Justice PARRISH joined.

Associate Chief Justice NEHRING filed a concurring opinion.

Associate Chief Justice NEHRING, concurring:

¶ 39 I concur in the holding of the court. I cannot, however, agree with the court's discussion of the timeliness of Mr. Harris's *Batson* challenge. The majority concludes that Mr. Harris's *Batson* challenge was untimely because he failed to meet his "absolute obligation" to notify the court that it must resolve the *Batson* challenge *before* the jury is sworn and the venire dismissed, even if it is the judge's suggestion that he delay the challenge.[1]

¶ 40 In the eyes of the majority, Mr. Harris irretrievably waived his *Batson* challenge when he acquiesced to the judge's request that he place his *Batson* challenge on the record after the venire was dismissed.[2] During the sidebar conference that Mr. Harris requested, he expressly raised a *Batson* challenge. The court proposed that a record be made of the challenge "during the break."[3] Under the majority's analysis, the record made pursuant to the court's instructions during the subsequent recess was pointless. Tellingly, Mr. Harris's first response to the trial judge's query about whether he passed the jury for cause was to request the sidebar conference at which he raised his *Batson* challenge.[4] The trial judge noted that Mr.

---

1. *Supra* ¶ 17 (citing *State v. Rosa–Re,* 2008 UT 53, ¶ 14, 190 P.3d 1259).

2. *Supra* ¶ 18.

3. *Supra* ¶ 8.

4. *Supra* ¶ 8.

Harris sought a *Batson* challenge when he announced that defense counsel had asked to approach on a *Batson* challenge.[5]

¶ 41 Although I concede that, as a practical matter, the court had no remedy at this point except to declare a mistrial in the event it concluded that Mr. Harris's *Batson* challenge was well-taken, the categorical rule that once the venire has been dismissed the *Batson* challenge has been waived would seemingly end the matter, irrespective of the likelihood that the complications caused by a mistrial at this early stage would be minimal.

¶ 42 I have little doubt that any attempt by Mr. Harris's counsel to "press" the court to make a definitive *Batson* ruling before excusing the venire would have been fraught with risk. The record clearly communicates that the trial judge was determined to move the proceeding along. The majority admits as much when it notes, in reference to the prosecution's response to the *Batson* challenge, that it was made "in the limited time she had." [6] And although Mr. Harris acquiesced "in the court's inaction," it was the court that asked counsel to delay his *Batson* challenge until a time when our precedent declares it untimely.[7]

¶ 43 In sum, I find that Mr. Harris's counsel conducted himself in a fully understandable manner when he sought to advance his *Batson* challenge. I am prepared, however, to accept, albeit with misgivings, our absolutist rule on *Batson* timing.