**2018 UT App 219**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RAYMOND JESUS MARQUINA,
Appellant.

Opinion
No. 20150854-CA
Filed November 23, 2018

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 141914264

Teresa L. Welch, Attorney for Appellant

Sean D. Reyes and Jeffrey S. Gray, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES KATE A. TOOMEY and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1    Appellant Raymond Jesus Marquina was convicted for aggravated robbery, a first degree felony, after he attempted to rob Victim and shot him five times. Marquina now appeals that conviction, contending that he is entitled to a new trial because at least one juror may have slept through a portion of his trial. Marquina also contends that his conviction should be vacated because there was insufficient evidence to place him at the scene of the crime. We affirm.

BACKGROUND[1]

*The Crime*

¶2      A few minutes after returning home from an evening out, Victim and his wife (Wife) heard a ring of the doorbell and a knock on the door. Victim opened the door and saw a man on his porch with a blue and white-streaked mask covering his face.[2] The man was about 5'5" tall and of average build. He said something that Victim could not understand and then "immediately started pulling" the trigger of his gun. Victim was shot five times in the neck and face.

¶3      Wife, who was upstairs during the attack, heard three gun shots and rushed to the top of the stairs where she had a view of the front door. She saw "an arm with a dark-colored covering" and a gloved hand holding a gun. Still from her vantage point, Wife saw Victim fall to the floor and gurgle "lots of blood" as he tried to yell for her. Wife called the police and, after they arrived, Victim was taken to the hospital.

¶4      Neighbors also heard the gunshots. One neighbor looked through his window and saw two persons wearing black hoodies running away. Another neighbor ran out of her house in an attempt to see the shooter. She did not see anyone but, upon approaching Victim's house, stumbled on a black mask in Victim's driveway. Police later recovered the mask and sent it to

---

1. On an appeal from a jury trial, "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified). "We present conflicting evidence only as necessary to understand issues raised on appeal." *Id.*

2. Victim acknowledged that he could not be sure of the color because he was red-green color deficient.

the crime lab for DNA testing. That testing led the police to a local drug dealer (Dealer).

### The Three Accomplices

¶5 Shortly before the shooting, Dealer decided to rob someone because he needed money to pay his rent. He had heard from several of his customers that Victim kept a lot of cash in his van and would be a good target. With help from his girlfriend (Girlfriend), Dealer made a plan to rob Victim.

¶6 Dealer then told his occasional chauffer (Driver) that he "had something [he] needed him to do." Driver was a drug addict who received free drugs from Dealer. He went along with Dealer and Girlfriend on the night of the robbery because Dealer, who "can't see well at night," needed someone to drive.

¶7 After a police investigation, Dealer, Girlfriend, and Driver admitted their involvement in the aggravated robbery of Victim. And all three placed Marquina at the scene of the crime.

¶8 Marquina, who was a member of the same gang as Dealer, had joined Dealer and Girlfriend at Dealer's apartment on the day of the robbery. While at the apartment, Dealer asked Marquina "if he wanted to go do some dirt with [him] real quick," and Marquina said he did.[3]

¶9 Dealer, Girlfriend, Driver, and Marquina then got into Dealer's car.[4] Dealer drove and placed a gun between the

---

3. "Dirt," as explained by Dealer, means a robbery.

4. The witnesses disagreed at trial about exactly when Marquina got in Dealer's car. Girlfriend testified that Marquina joined them as soon as they left Dealer's apartment, but Dealer and Driver testified that Marquina followed them in his own truck to

(continued…)

driver's seat and the emergency brake. Because they did not know where Victim lived, Girlfriend tried searching the internet to find his address. Her search initially led them to the wrong neighborhood, but they eventually found Victim's house with Victim's van parked outside. They drove around the neighborhood "for what seemed like forever" until Girlfriend asked Dealer, "Are you going to do this or not?"

¶10 Dealer and Marquina eventually got out of the car, while Driver took the driver's seat and circled the car around the block. Both Dealer and Marquina wore black hoodies, and Dealer brought two masks—one black and one blue with white streaks. Marquina put on the blue and white-streaked mask, but Dealer was unable to get his black mask on and threw it back toward his car. On the way to Victim's front door, Dealer got nervous and sent Marquina to the door alone. Marquina rang the doorbell and knocked. When Victim answered, Marquina shot him.

¶11 Marquina and Dealer then ran up Victim's street until they spotted Dealer's car. They yelled for Driver to stop and got in the backseat. Driver then drove straight back to Dealer's apartment. Once there, Marquina went his own way. Girlfriend phoned Marquina repeatedly that night to "see if he was okay," but Marquina never answered.[5]

---

(…continued)
a parking lot a few blocks away from Victim's house, parked his truck, and then got in Dealer's car.

5. Marquina's cell phone records show a number of calls and text messages from Girlfriend both before and after the shooting. But during the time of the robbery—from about 9:18 p.m. to 11:10 p.m.—there was no phone activity between Girlfriend and Marquina.

¶12    A few weeks later, after the police had questioned Dealer, Girlfriend, and Driver, each of whom implicated Marquina in the shooting, Marquina was arrested. Marquina's driver license listed him as 5'6" and 120 pounds. Shortly after Marquina's arrest, the police conducted a photo array identification with Victim, who survived the shooting. Marquina's photograph was in the array, but Victim identified someone else as the shooter.

*The Trial*

¶13    The State charged Marquina with one count of aggravated robbery, which included a group enhancement.[6] Dealer, Girlfriend, and Driver each testified at Marquina's trial. Dealer had pled guilty to the aggravated robbery and agreed to testify even though it was "going to make [his life in prison] worse." He did not expect to receive "any benefit whatsoever" for testifying. Girlfriend pled guilty to obstruction of justice, but in exchange for her testimony against Marquina, she was placed on probation in lieu of incarceration. Driver also struck a deal that, in exchange for his testimony, he would be placed on probation for robbery and would enter a rehabilitation program. Although all three of their accounts varied in some particulars, each witness placed Marquina at the scene of the crime. *See supra* ¶¶ 7–12.

¶14    The trial lasted three days. On the second and third days, the prosecutors mentioned a sleepy juror. The first time, defense

---

6. Under Utah Code section 76-3-203.1, a criminal defendant is subject to "an enhanced penalty" if the defendant acted "in concert with two or more persons." Utah Code Ann. § 76-3-203.1(2)(a), (5)(i) (LexisNexis 2017). Because Marquina allegedly robbed Victim "in concert" with Dealer, Girlfriend, and Driver, the State sought a group enhancement under this section.

counsel was in the middle of cross-examining one of the detectives on the case when one prosecutor noticed a juror "nodding off." The prosecutor asked for a break so the jurors could stretch, and the court agreed to take a fifteen-minute recess.

¶15 The second time, after reading the jury instructions, the court discussed with counsel its intention to make the last-selected juror the alternate unless the parties agreed on someone else. In response, a second prosecutor noted that "we do have someone who has been sleeping through part or— not all but part of the testimony" and reasoned that, because closing arguments were likely to be lengthy, it would "probably [be] safer to use the alternate . . . as an actual juror." The prosecutor further explained that the juror "has been dozing off here now, but there have been moments when he has been seemingly out." Defense counsel stated he "ha[d] not noticed any of the jurors sleeping," but that he "ha[d not] really been focusing on them." Defense counsel went on to refer to a judge who "is often mistaken by many counsel to be sound asleep . . . when the truth of the matter is he is just resting his eyes," and that counsel will realize that "not only has he been listening but he has been processing everything in a very high way." The court then observed that "everyone tried to stay awake" and, with no objection from counsel, left the jury as it was. The court also invited counsel to alert the court if they "change[d] [their] mind[s] after closing" and stated, "We will be looking at [the jury] this time."

¶16 Neither side raised further concerns after closing argument. The alternate juror was excused and the jury retired to deliberate. The jury unanimously found Marquina guilty of aggravated robbery, and Marquina appeals.

ISSUES AND STANDARDS OF REVIEW

¶17    Marquina raises two issues on appeal. First, he contends that his Sixth Amendment right to an impartial jury was violated because at least one juror reportedly slept during his trial. Normally, "[c]onstitutional issues are questions of law that we review for correctness," *State v. Norcutt*, 2006 UT App 269, ¶ 7, 139 P.3d 1066, but unpreserved constitutional issues, as Marquina concedes this is, are reviewed "under the ineffective assistance of counsel and plain error doctrines," *see State v. Bond*, 2015 UT 88, ¶ 14, 361 P.3d 104.

¶18    Second, Marquina contends that there was insufficient evidence to support his conviction for aggravated robbery. "When a defendant challenges a jury verdict for insufficiency of the evidence, we review the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict." *State v. Noor*, 2012 UT App 187, ¶ 4, 283 P.3d 543 (quotation simplified); *see also State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664 ("On a sufficiency of the evidence claim we give substantial deference to the jury."). We will reverse a jury verdict only when "the evidence is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted." *State v. Holgate*, 2000 UT 74, ¶ 18, 10 P.3d 346 (quotation simplified).

ANALYSIS

I. Sixth Amendment Jury Right

¶19    The Sixth Amendment guarantees criminal defendants "the right to . . . an impartial jury." U.S. Const. amend. VI. Marquina contends that he was denied this right when a juror

reportedly fell asleep during the trial. In support, he argues that the trial court had a duty to conduct voir dire[7] of the allegedly sleepy juror to ensure the juror had not missed important testimony. He also argues that his defense counsel was constitutionally ineffective when he failed to insist that the court conduct voir dire or, if necessary, replace the sleepy juror with the alternate juror.

¶20 As noted above, Marquina concedes that this constitutional issue has not been preserved for appeal. *See State v. Johnson*, 2017 UT 76, ¶ 18, 416 P.3d 443 ("A failure to preserve an issue in the trial court generally precludes a party from arguing that issue in an appellate court, absent a valid exception."). Marquina nevertheless urges us to review it under the plain error and ineffective assistance of counsel exceptions to the preservation rule. *See State v. Ison*, 2006 UT 26, ¶ 39, 135 P.3d 864 (ineffective assistance exception); *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (plain error exception). But before we reach those arguments, we must address whether Marquina invited the error he now complains of by allegedly resisting the replacement of the sleepy juror with the alternate. *See Winfield*, 2006 UT 4, ¶ 14 (explaining that the invited error doctrine forecloses even plain error review). Concluding that the invited error doctrine does not apply in this case, we then turn to the plain error argument regarding the trial court's alleged failure to conduct voir dire of the sleepy juror and then the ineffective assistance argument regarding defense counsel's alleged failure to insist on replacing the juror with the alternate.

---

7. Voir dire is an "examination of a prospective juror by a judge or lawyer to decide whether the prospect is qualified and suitable to serve on a jury." *Voir Dire*, Black's Law Dictionary (10th ed. 2014). Typically, voir dire refers to jury selection at the outset of trial but, in this case, it encompasses examinations after the jury has been selected.

A.     Invited Error

¶21     The State asserts that Marquina's defense counsel invited any error regarding the sleepy juror by resisting the prosecutor's suggestion that the sleepy juror be replaced with the alternate. By rejecting the prosecutor's suggestion, and even disputing "the prosecutor's observation that the juror had slept through 'part of the testimony,'" the State maintains that defense counsel "led the court to believe there would be no reason to question the juror." We disagree.

¶22     The "invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error." *State v. Winfield*, 2006 UT 4, ¶ 15, 128 P.3d 1171 (quotation simplified). Invited error occurs when counsel "independently ma[kes] a clear affirmative representation of [an] erroneous principle" that leads the court astray. *State v. McNeil*, 2016 UT 3, ¶ 18, 365 P.3d 699 (citing cases).

¶23     The Utah Supreme Court has previously rejected attempts to broaden the scope of the invited error doctrine beyond this affirmative-representation model. In *McNeil*, the State argued that trial counsel for the defendant had invited error not through "affirmative representation" but through "affirmative acquiescence" by failing to make a proper objection to the admission of hearsay evidence. *Id.* ¶¶ 18, 21 (quotation simplified). The supreme court was unpersuaded by this argument "because an error of this sort . . . is not invited but merely unpreserved." *Id.* ¶ 21. It accordingly "reject[ed] [the State's] broad definition of invited error" and reviewed the defendant's claim for plain error. *Id.* ¶¶ 21, 24; *see also State v. Harris*, 2012 UT 77, ¶ 23, 289 P.3d 591.

¶24     Here, Marquina's defense counsel, while perhaps affirmatively acquiescing in the court's decision to keep the current composition of the jury without making further inquiry,

did not make any affirmative representation to the court that the panel was acceptable. *See Winfield*, 2006 UT 4, ¶ 18 (concluding that counsel's affirmative representation that he "absolutely found the panel acceptable" during jury selection "f[ell] squarely within the scope of [the] invited error doctrine" (quotation simplified)). After the prosecutor alerted the court that "someone . . . ha[d] been sleeping through part . . . of the testimony," defense counsel responded by saying that he "ha[d] not noticed any of the jurors sleeping," but that he "ha[d not] really been focusing on them." Counsel went on to explain the difficulty in knowing whether someone really was sleeping and pointed to the possibility that someone might just be "resting [his or her] eyes" but still "processing everything in a very high way." The court then decided to keep the jury as it was but to keep an eye on the jurors. It also informed counsel that if they changed their minds, they could revisit the issue. From the record it is clear that defense counsel did not affirmatively tell the court to either forgo voir dire or to not replace the juror with the alternate. And although the court told counsel they could change their minds, defense counsel's failure to thereafter request an alternate juror does not make the error here "invited but merely unpreserved." *See McNeil*, 2016 UT 3, ¶ 21.

¶25 To be sure, the State characterizes defense counsel's response here as an affirmative representation and not merely acquiescence. For example, it asserts that counsel "openly resisted the prosecutor's request" to substitute the alternate juror for the sleepy juror and that he "clearly indicated that he did not want the allegedly sleepy juror relegated to alternate status." We disagree with these characterizations. Although it is true that defense counsel did not ask for the juror to be questioned, and instead suggested an alternative to the prosecutor's theory that the juror was asleep, he did not affirmatively state that the court should not conduct voir dire of the sleepy juror or replace him. Thus, his statements do not "reveal[] that [he] independently made a clear affirmative representation of the erroneous principle." *See id.* ¶ 18. In short, on these facts, we do not think

Marquina's defense counsel invited the error. We therefore proceed to analyze the sleeping juror issue for plain error.

B.     Plain Error

¶26    Marquina contends that the trial court committed plain error, arguing that "the trial court failed to properly voir dire the sleeping juror after receiving two reliable reports that a juror was sleeping during a portion of the trial." He also asserts that this error was obvious because Utah case law establishes "the need for a trial judge to assess the jurors' ability to deliberate and decide a case" and "[c]ase law across the nation" establishes that "a trial judge [must] do a proper voir dire of a juror after receiving a reliable report that a juror has been sleeping." Finally, he asserts that the error was prejudicial because "a fully awake juror would . . . have recognized the problems" in the State's case and may have helped acquit him.

¶27    We invoke the plain error exception to the preservation requirement "sparingly." *State v. Harris*, 2012 UT 77, ¶ 24, 289 P.3d 591. "To show plain error, a party must establish three things: (1) that an error exists, (2) that the error should have been obvious to the trial court, and (3) that the error is harmful." *Id.* "If any one of these requirements is not met, plain error is not established." *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (quotation simplified). Thus, if we conclude that the alleged error was not obvious, we need not analyze whether it was harmful. *See, e.g.*, *Harris*, 2012 UT 77, ¶ 25.

¶28    "To establish that the error should have been obvious to the trial court, [Marquina] must show that the law governing the error was clear at the time the alleged error was made." *See Dean*, 2004 UT 63, ¶ 16. In other words, there must be "settled appellate law to guide the trial court." *State v. Robinson*, 2018 UT App 103, ¶ 40, 427 P.3d 474 (quotation simplified).

¶29    In the handful of Utah appellate cases discussing a sleeping juror's effect on a trial, one principle predominates:

discretion. Indeed, handling a sleeping juror is "so peculiarly within the observation, province, and discretion of the trial court that we should not interfere with the ruling, except upon a clear abuse of discretion." *State v. Mellor*, 272 P. 635, 639 (Utah 1928); *see also State v. Lesley*, 672 P.2d 79, 82 (Utah 1983) (stating that the "trial judge was in a position to gauge the degree, if any, of the juror's incapacity to serve in the trial" and affirming the denial of a motion for a mistrial after a juror allegedly fell asleep); *State v. Pace*, 527 P.2d 658, 659 (Utah 1974) (noting the "sound discretion of the trial judge" and affirming the denial of a motion for a mistrial after two jurors allegedly fell asleep). Generally speaking, a trial court abuses its discretion when its decision is "beyond the limits of reasonability." *Ross v. State*, 2012 UT 93, ¶ 57, 293 P.3d 345 (quotation simplified).

¶30    Marquina reads *Mellor*, *Lesley*, and *Pace* as saying that a trial court is under a duty "to inquire about the scope and importance of the testimony that a sleepy juror misse[d]." Only after this inquiry, according to Marquina, is a trial court entitled to deference as in *Mellor*, *Lesley*, and *Pace*. For example, Marquina asserts that in *Mellor*, our supreme court observed that the trial court made a "finding" that the juror "at several different times had gone to sleep, but only for two or three minutes, just a short time." *See* 272 P. at 639. The juror testified that he had "heard and understood all that transpired in the courtroom during the trial." *See id.* In Marquina's view, this testimony allowed the court to find that the "juror could decide the case because he heard the testimony offered at trial." Marquina asserts that the court in this case made no such finding and therefore, under "well-established . . . Utah case law," is not entitled to the same deference as in *Mellor*.

¶31    The "settled appellate law" in Utah, however, does not resemble the picture Marquina paints on appeal. Our supreme court in *Mellor* indicated that the trial court found that the juror slept for only a short time, but the supreme court did not announce a rule or template trial courts must follow whenever

they are confronted with reports of a sleepy juror. *See id.* Instead, *Mellor* established that trial courts, when presented with reports of sleeping jurors, are given wide discretion in how to respond. *Id.* And the specific response depends on the facts of the case, including how the issue was brought to the court's attention. *See Lesley*, 672 P.2d at 80–82 (discerning no abuse of discretion in denying a motion for a mistrial when defense counsel "made no complaint about the juror during the proceedings, but merely moved for a mistrial after the judge recessed court"); *Pace*, 527 P.2d at 659 (affirming the denial of a motion for a mistrial because the court personally "observed the whole jury" and saw the sleeping juror wake up before it "had a chance to call it to [the juror's] attention" (quotation simplified)).

¶32    Here, on the second day of trial, the prosecutor alerted the court that a juror was "nodding off" and requested a break to allow the jury to stretch. The prosecutor's report did not suggest to the court that the juror had actually fallen asleep or had been sleeping for an extended period, and the prosecutor's request for a break suggested that no more was needed to remedy the issue. Based on the wide discretion given to trial courts in these circumstances, it would not have been obvious to the trial court that it was required to do more than grant the State's request for a short recess.

¶33    And on the third day of trial, the prosecutor suggested it may be "safer" to use the alternate juror based on her observation that a juror had been "sleeping through part . . . of the testimony" and at times had been "seemingly out." Defense counsel, however, responded that he had not seen anyone sleeping and expressed no concern, even suggesting that what may look like sleep instead may be deep thought. Thus, it would not have been obvious to the trial court that it was required to do more than what it did. The trial court stated it would keep a close eye on the jurors and also gave counsel on both sides an opportunity to "change [their] mind[s]" and ask for the juror to be replaced with the alternate, but neither raised

the issue again.[8] On this record, we cannot conclude that the trial court plainly erred in how it chose to handle the sleepy juror.

¶34 Marquina also looks outside Utah for authority that a trial court is obliged to conduct voir dire whenever it receives a "reliable report" of a sleeping juror. He points to cases from Massachusetts, New York, Ohio, and South Carolina to support his position.[9] But none of these cases are binding. And even assuming that nonbinding precedent from other jurisdictions could constitute "settled appellate law" for purposes of our obviousness inquiry, *see Robinson*, 2018 UT App 103, ¶¶ 40–41 (quotation simplified), the cases cited by Marquina do not represent a settled consensus. Utah law does not require a court to conduct sua sponte a voir dire after a report of a sleepy juror, and a number of federal circuits that have addressed the issue likewise do not require voir dire. *United States v. McKeighan*, 685 F.3d 956, 975 (10th Cir. 2012) (concluding there was no error in not investigating whether jurors were sleeping when defense counsel did not ask the court to investigate or request the substitution of alternate jurors); *United States v. Freitag*, 230 F.3d 1019, 1024 (7th Cir. 2000) (rejecting the argument that a "district judge should have inquired further" when the judge "had not noticed an extensive sleeping problem"); *United States v. Holder*, 652 F.2d 449, 451 (5th Cir. 1981) (similar). Therefore, any error in not following the cases Marquina cites would not have been

---

8. As discussed below, *infra* ¶ 39, we presume defense counsel's actions might be considered sound trial strategy, and we observe that a trial court "is not required to constantly survey or second-guess a nonobjecting party's best interests or trial strategy." *State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (quotation simplified).

9. *See Commonwealth v. McGhee*, 25 N.E.3d 251, 255–58 (Mass. 2015); *People v. Franqui*, 999 N.Y.S.2d 40, 41 (App. Div. 2014); *State v. Majid*, 914 N.E.2d 1113, 1114–17 (Ohio Ct. App. 2009); *State v. Hurd*, 480 S.E.2d 94, 97 (S.C. Ct. App. 1996) (per curiam).

obvious to the trial court. Accordingly, Marquina has not established plain error. *See Pace*, 527 P.2d at 659 ("Hence there seems to have been nothing in the eyes of the beholder, nor in the arms of Morpheus reflecting that the juror could have been ensconced, so as to have stupefied the veniremen, or the sound discretion of the trial judge.").

C.     Ineffective Assistance of Counsel

¶35     Alternatively, Marquina contends that his defense counsel rendered constitutionally ineffective assistance of counsel. He argues that his counsel's performance "was deficient in failing to object to the sleeping juror" and in failing "to agree to the prosecutor's request to replace the sleeping juror with the alternate." Further, he asserts that there "would be no strategic choice by defense counsel to insist on keeping a sleeping juror in this matter."

¶36     The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984). To show ineffective assistance, a defendant must show (1) that his counsel's performance was objectively deficient, and (2) "that the deficient performance prejudiced the defense." *Id.* at 687–88. "A failure to prove either element defeats the claim." *State v. Horvath*, 2018 UT App 165, ¶ 30 (quotation simplified).

¶37     "With regard to the first prong, we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *State v. Calvert*, 2017 UT App 212, ¶ 22, 407 P.3d 1098 (quoting *Strickland*, 466 U.S. at 689). The "presumption may be overcome only if there is a lack of any conceivable tactical basis for counsel's actions." *State v. King*, 2012 UT App 203, ¶ 14, 283 P.3d 980 (quotation simplified). "This presumption accounts for the widely varying circumstances faced by defense counsel and the range of legitimate decisions regarding how best

to represent a criminal defendant." *Met v. State*, 2016 UT 51, ¶ 113, 388 P.3d 447 (quotation simplified). And counsel is given an especially wide berth with regard to jury selection and retention. *See State v. Litherland*, 2000 UT 76, ¶ 20, 12 P.3d 92. This is because "jury selection is more art than science":

> There are a multitude of inherently subjective factors typically constituting the sum and substance of an attorney's judgments about . . . jurors. A . . . juror's demeanor, interaction with others in the courtroom, and personality in general may all play an important role in providing clues as to that juror's likely predilections toward the case at hand.

*Id.* ¶ 21.[10]

¶38 Counsel's choices about the jury "may even appear counterintuitive, particularly when viewed from the perspective of a bare transcript on appeal." *Id.* ¶ 22. For example, counsel may reasonably think that a potentially biased juror may "overcompensate" and "assign[] more weight or credibility to testimony that tends to oppose the juror's own potential bias." *Id.* At bottom, an attorney's decisions regarding the jury "legitimately may be based on little more than personal preference." *Id.* ¶ 23.

---

10. *Litherland* discussed jury selection at the outset of trial. Although here we address the potential substitution of a juror near the end of trial, we agree with the State that *Litherland*'s rationale applies. Indeed, by the end of trial, counsel will have had even more time to observe jurors and determine their "likely predilections toward the case." *See State v. Litherland*, 2000 UT 76, ¶ 21, 12 P.3d 92.

¶39    Here, we must presume Marquina's defense counsel's conduct fell "within the wide range of reasonable professional assistance." *Calvert*, 2017 UT App 212, ¶ 22 (quotation simplified). Jury selection and retention are "more art than science," *Litherland*, 2000 UT 76, ¶ 21, and Marquina's counsel was able to observe the jurors, including the alternate, over the course of three days. Everything from the jurors' demeanors to their reactions to testimony may have played a role in counsel's decision not to insist on replacing the sleepy juror. He may have simply preferred the jury he had. Even if this choice seems "counterintuitive," counsel may have reasonably thought that a sleepy juror would "overcompensate" and would be reluctant to convict. *See id.* ¶ 22 (quotation simplified). Moreover, counsel's choices are viewed objectively; "[t]he first prong of the *Strickland* standard . . . requires that a defendant rebut the strong presumption that under the circumstances, the challenged action *might* be considered sound trial strategy." *Id.* ¶ 19 (emphasis added) (quotation simplified). Marquina argues that without knowing who the sleepy juror was or insisting on an inquiry into what was missed, his defense counsel "could not make a reasonable tactical decision" to keep the juror. But even without knowing who the sleepy juror was, defense counsel may have preferred *any* of the actual jurors over the alternate juror. Moreover, although the record is unclear as to which juror may have been sleeping, the prosecutor might have communicated the information off the record. Therefore, we will not presume that counsel's conduct here was unreasonable "viewed from the perspective of a bare transcript on appeal." *See id.* ¶ 22. Because Marquina has not demonstrated his counsel was objectively deficient, he has not established ineffective assistance of counsel.

## II. Sufficiency of the Evidence

¶40    Marquina next contends that there is insufficient evidence to convict him of aggravated robbery. He asserts that there is no physical or DNA evidence placing him at the crime scene and that "the only evidence that placed [him] at the crime scene was

the unreliable, inconsistent and biased testimonies of" Dealer, Girlfriend, and Driver. Therefore, because there is insufficient evidence to place Marquina at the crime scene, Marquina argues that his conviction should be reversed.

¶41   We first address whether this argument was preserved below. After concluding that it was not, we review the claim for plain error.

A.   Preservation

¶42   As with other claims, "a defendant must raise the sufficiency of the evidence by proper motion or objection to preserve the issue for appeal." *State v. Holgate*, 2000 UT 74, ¶ 16, 10 P.3d 346. This is generally done through a motion for a directed verdict. *See State v. Mohamed*, 2012 UT App 183, ¶ 2, 282 P.3d 1066 (per curiam). But to preserve an issue for appeal, "the issue must be *specifically* raised such that the issue was sufficiently raised to a level of consciousness before the trial court." *Id.* (emphasis added) (quotation simplified). Thus, the basis for the motion for a directed verdict must be the same as the basis for the insufficiency claim urged on appeal. *See id.* (concluding an insufficiency argument was unpreserved because the basis for the motion for a directed verdict at trial differed from what was argued on appeal); *see also State v. Noor*, 2012 UT App 187, ¶ 7, 283 P.3d 543 (same).

¶43   Here, Marquina contends that his insufficiency argument was preserved through a motion for a directed verdict at trial. But the basis for that motion was that there was insufficient evidence of a robbery—not that Marquina was absent from the scene of the crime. At trial, Marquina's defense counsel argued that there was "no evidence of a robbery" because "there [was] no evidence that there was an attempt or an effort to steal anything." His counsel conceded, however, that the evidence "d[id] show, perhaps, an aggravated assault or perhaps an attempted murder." Now on appeal, Marquina argues not that

there was insufficient evidence of a robbery but that there was insufficient evidence to support the assertion that he was there. This argument was not "specifically raised such that the issue was sufficiently raised to a level of consciousness before the trial court." *See Mohamed*, 2012 UT App 183, ¶ 2 (quotation simplified). Therefore, it was not preserved for appeal.

B.     Plain Error

¶44    Marquina contends that the insufficiency of the evidence placing him at the scene of the crime is "so obvious and fundamental" that it can be reviewed for plain error. (Quotation simplified.) Marquina's arguments in support of this contention generally relate either to a lack of physical evidence placing him at the crime scene or to the "unreliable, inconsistent, and biased testimonies" of Dealer, Girlfriend, and Driver.

¶45    To establish plain error in this context, "a defendant must demonstrate first that the evidence was insufficient to support a conviction of the crime charged and second that the insufficiency was so obvious and fundamental that the trial court erred in submitting the case to the jury." *State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346. On the first prong of that test, "we give substantial deference to the jury." *State v. Ashcraft*, 2015 UT 5, ¶ 18, 349 P.3d 664. "We do not sit as a second trier of fact: It is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses." *State v. Boyd*, 2001 UT 30, ¶ 16, 25 P.3d 985 (emphasis omitted) (quotation simplified); *see also State v. Pendergrass*, 803 P.2d 1261, 1267 (Utah Ct. App. 1990) ("We defer to the jury because a jury is in the best position to give proper weight to the peripheral nature of any contradictory testimony." (quotation simplified)).

¶46    Importantly for this case, "[a] conviction may be had on the uncorroborated testimony of an accomplice." Utah Code Ann. § 77-17-7(1) (LexisNexis 2017). And while the defense can put on evidence to try to undermine that testimony, "the jury is

not obligated to believe that evidence," *State v. Smith*, 706 P.2d 1052, 1056 (Utah 1985), or "compelled to accept the existence of reasonable doubt posited by the defense's finger-pointing," *Ashcraft*, 2015 UT 5, ¶ 29. "So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops." *Boyd*, 2001 UT 30, ¶ 16 (quotation simplified).

¶47 Marquina's challenge to the sufficiency of the evidence is effectively resolved by *Smith*. In that case, a defendant was convicted of aggravated robbery. *Smith*, 706 P.2d at 1054. The only evidence linking him to the crime was the testimony of two accomplices, each of whom had struck a deal with the prosecutors for blanket immunity or dropped charges in exchange for their truthful testimony. *Id.* at 1054–55. Although the victim of the crime was unable to identify his assailants, the accomplices testified to their involvement in the robbery and that the defendant was the getaway driver. *Id.* at 1055. After being convicted, the defendant argued that there was insufficient evidence to support the jury's verdict. *Id.* Our supreme court noted that "[t]here [was] no question that conflicting evidence was adduced at trial which would negate defendant's participation in the . . . robbery." *Id.* at 1056. But the court stated that "the jury [was] not obligated to believe that evidence" and concluded that, based on the accomplice testimony alone, "the evidence was not so lacking and insubstantial that a reasonable person could not have determined beyond a reasonable doubt that defendant committed [the] robbery." *Id.* at 1056–57.

¶48 Similarly, the evidence here is "not so lacking and insubstantial that a reasonable person could not have determined" that Marquina committed the crime. *See id.* Although Victim was unable to identify Marquina's photo in the photo array, he was able to roughly describe Marquina's height and weight (about 5'5'' tall and average build) and the blue and white-streaked mask that Girlfriend testified Marquina wore. And even without that evidence, the three accomplices—Dealer,

Girlfriend, and Driver—each admitted to their involvement in the crime and placed Marquina at the crime scene. *See* Utah Code Ann. § 77-17-7(1) ("A conviction may be had on the uncorroborated testimony of an accomplice.").

¶49 As in *Smith*, some of the accomplices here reached a deal with prosecutors for their truthful testimony, though Dealer testified that he did not expect to receive "any benefit whatsoever" for testifying at Marquina's trial and that it was "going to make [his life in prison] worse." The defense was free to present evidence to show the witnesses' unreliability or biases, which it did. The defense was also able to point out inconsistencies in the witnesses' testimonies. But "the jury [was] not obligated to believe that evidence." *Smith*, 706 P.2d at 1056. The witnesses' accounts differed in some particulars, but as to the core issue—Marquina's involvement in the aggravated robbery of Victim—the stories were consistent. At bottom, it was for the jury to "weigh the evidence and to determine the credibility of the witnesses." *Boyd*, 2001 UT 30, ¶ 16 (quotation simplified). On appeal, we will not second-guess the jury or "sit as a second trier of fact." *Id.* Thus, viewing the facts in the light most favorable to the verdict, we cannot say the insufficiency of the evidence here "was so obvious and fundamental that the trial court erred in submitting the case to the jury." *See State v. Holgate*, 2000 UT 74, ¶ 17, 10 P.3d 346.

CONCLUSION

¶50 We conclude that Marquina has not demonstrated that the trial court plainly erred in not sua sponte conducting voir dire or removing an allegedly sleepy juror. We likewise conclude that Marquina has not demonstrated that his defense counsel rendered constitutionally ineffective assistance by not requesting that the juror be removed. Finally, we conclude that the evidence was not so lacking that the trial court plainly erred in submitting the case to the jury. Accordingly, we affirm.

_____